Merrimack
No. 6832

JAMES E. O'NEIL, SR. & a.

v.

MELDRIM THOMSON, JR., AS GOVERNOR

February 28, 1974

*McLane, Graf, Greene & Brown* and *Richard S. Snierson (Mr. Stanley M. Brown* orally) for James E. O'Neil, Sr. and others as members of the New Hampshire General Court and individually.

*Cleveland, Waters & Bass* and *Robert T. Clark (Mr. Clark* orally) for State Employees' Association of New Hampshire, Inc.

*Charles G. Douglas III,* legal counsel to the Governor, by brief and orally, for Meldrim Thomson, Jr.

*Stanton E. Tefft,* by brief and orally, for intervenors, being seven members of the House of Representatives in opposition to the petition.

LAMPRON, J. Petition for a declaratory judgment and other relief brought against Meldrim Thomson, Jr., as Governor, by certain members of the General Court in their capacity as president and vice president of the senate and as speaker and deputy speaker of the house and as minority leaders of the senate and the house and as individual taxpayers. Also a plaintiff is the New Hampshire State Employees' Association, Inc., a voluntary corporation, in its own right and on behalf of its members and of all classified employees for whom it is the bargaining agent. The plaintiffs seek a declaration that certain Executive Orders promulgated by the Governor are "illegal, unconstitutional and void". Seven members of the house of representatives intervened in opposition to the action.

The Trial Court (*Keller,* C.J.) found that: "No useful purpose would appear to be served by evidentiary hearings in this Court, since the basic issues are of constitutional law and of statutory interpretation, and all parties indicate that a final determination by the Supreme Court is desirable." All questions of law raised by the pleadings of the parties were reserved and transferred to this court without rulings by the trial court.

The challenged Executive Orders are as follows:

(1) No. 73-14 promulgated on July 10, 1973 which in pertinent part provided: "[I]t is hereby ordered and promulgated that effective this date no new permanent or new temporary classified personnel shall be hired without the prior approval of the Governor or his designee. Such approval will be given only when the need is clear-cut and failure to employ the additional personnel will clearly decrease our ability to meet the needs of the people of our State. This freeze shall be effective until September 10, 1973, unless sooner terminated by the Governor. All requested positions shall be certified to the Governor by the appropriate department head.

"Existing temporary employees who would have normally converted to permanent status under legislative enactment

in the 1973 session of the General Court will be allowed to be extended only to September 10, 1973, out of funds appropriated for their employment unless otherwise authorized by the Governor or his designee."

The first part of the above order pertaining to new permanent and new temporary classified personnel was extended to April 1, 1974, by successive Executive Orders. The second part relating to the conversion of existing temporary employees to permanent status was revoked by Executive Order 73 - 28 (December 21, 1973) which provided that such employees were authorized to be converted to permanent status effective retroactively to July 1, 1973.

(2) No. 73 - 15 issued July 16, 1973 which provided that because of the energy crisis and the need to operate the State government as economically and as efficiently as possible a "ban was ordered . . . on the purchase of all automobiles for State use until September 17th 1973 . . . . Exceptions to the ban may be made by the Governor upon written request from an agency head stating the reason why an exception should be made." On December 21, 1973, (Executive Order 73 - 29) this order was amended to provide: "No State department or agency shall purchase a new motor vehicle without the approval of the Governor's Inter-Office Motor Vehicle Committee," a committee composed of certain department heads and a representative of the Executive Office. The order was to remain in effect until terminated by the Governor.

(3) No. 73 - 16 issued August 14, 1973 read in part as follows: "[I]t is hereby ordered and promulgated that effective this date no transfers or promotions of State employees having a labor grade of 17 or higher shall be made between any department, agency, board, or commission without the prior approval of the Governor . . . All requested transfers or promotions shall be certified to the Governor pursuant to this executive order by the appropriate department, agency or commission head." All of the above orders were issued by the Governor "by virtue of the authority vested in me under New Hampshire Constitution, Part 2, Article 41 as the supreme executive magistrate of the State."

The plaintiffs in their several capacities have sufficient right and interest in the "performance by public officers of their

public duties" and in "the preservation of an orderly and lawful government" to entitle them to maintain these proceedings. *N.H. &c. Beverage Ass'n v. Commission,* 100 N.H. 5, 6, 116 A.2d 885, 886 (1955). Their petition for declaratory judgment is a particularly appropriate action when the parties desire and the public need requires a speedy determination of the important issues in controversy. *Chronicle &c. Pub. Co. v. Attorney General,* 94 N.H. 148, 150, 48 A.2d 478, 479 (1946); *Austin v. State Tax Comm'n,* 114 N.H. 137, 316 A.2d 165 (1974).

Their solution involves an interpretation of our State constitution and of statutes relative to the executive and legislative branches of our government. This is a traditional function conferred on the judiciary for which it is responsible. It is not within the competence of the other two branches and consequently does not fall within the bar against confiding political questions to the courts. N.H. CONST. pt. I, art. 37, pt. II, art. 72-a; *Cloutier v. State Milk Control Bd.,* 92 N.H. 199, 201-02, 28 A.2d 554, 556 (1942); *see Powell v. McCormack,* 395 U.S. 486 (1969). Nor does this petition violate the doctrine of sovereign immunity as it is not an action against the State but rather a proceeding to prevent the Governor from enforcing Executive Orders which are claimed to be beyond his powers to promulgate. *Conway v. Water Resources Board,* 89 N.H. 346, 348, 199 A. 83, 86 (1938); *see Fortin v. Morton,* 101 N.H. 477, 147 A.2d 644 (1958).

Even though part of Executive Order No. 73 - 14 has been revoked we hold that the petition should not be dismissed for mootness as we believe justice requires that the matters in issue be decided so that all officials concerned "may know where they stand". *Sugar Hill Improvement Ass'n v. Lisbon,* 104 N.H. 40, 42, 178 A.2d 512, 513-14 (1962). The defense of laches does not prevent the maintaining of this petition as it deals with appropriations separate and distinct from those in effect when inaction on the part of the plaintiffs is alleged. No prejudicial delay appears in regard to the present appropriations and Executive Orders pertaining thereto.

The legislature exercises one of the three "essential powers" of our government. N.H. CONST. pt. I, art. 37.

The General Court composed of the senate and the house of representatives is invested with the "supreme legislative power" within this State. N.H. CONST. pt. II, art. 2. It has the power to make laws; to name all civil officers (with exceptions not material in this case) and to define their duties and powers; to assess taxes to raise revenue for the operation of the government of the State and to make appropriations for that purpose. *Id.* arts. 5, 18. No moneys are to be issued out of the treasury of the State unless "there be an appropriation, or equivalent direction for payment, by the Legislature." *State v. Kimball,* 96 N.H. 377, 380, 77 A.2d 115, 119 (1950); RSA 6:10 (Supp. 1973).

Under these powers the General Court has created State departments and assigned broad powers and duties to the heads of these executive departments. *E.g.,* RSA ch. 8; RSA ch. 8-B; RSA ch. 8-C; RSA ch. 12; RSA ch. 106-A; RSA ch. 126-A. The General Court has also established a "Unified Personnel System For The State" which provides for the recruitment, appointment, compensation, promotion, transfer, layoff, removal, and discipline of State employees. R.L. ch. 27-B. This system has been expanded and revised to meet changing conditions. RSA ch. 98; ch. 98-A; ch. 98-B; ch. 98-C; ch. 98-D; ch. 99 (Supp. 1973). RSA 98:1 provides as follows: "Neither the governor nor council shall be required to approve the employment, or salary, of any employee within the state classified service, except as such approval may be specifically required by law."

The legislature has established the procedure to be followed in establishing budgets and making appropriations for all State departments. RSA ch. 9. Unlike any previous budget, those for fiscal years 1974 and 1975 with which we are concerned in these proceedings were prepared in a "program appropriation unit format" (PAU) as required by RSA 9:8-a (Supp. 1973). This method requires the submission by the departments of new information such as "program descriptions of activities, workload, output, and improved financial data." Budget Manual, Fiscal Years 1974-1975, at 1. The department administrators must submit to the Governor and to the legislative

appropriations committees PAU forms showing how they intend to spend the funds requested whether for existing programs, their expansion, new programs, additional personnel, new automobiles, supplies, travel and other specified items. In the case of a request for new positions, the PAU form must show why they are needed, what they will accomplish, when the hirings will take place, and the classification and salary of the employees.

This new approach called for legislative judgments regarding the scope and value of individual budget requests. The records of the legislative committee hearings both in the house and then in the senate reveal searching inquiries into the details of the spending items sought by the various departments. The appropriations committees were thus in a position to make a legislative determination whether or not a program should be inaugurated, continued, expanded, or discontinued, or a contrary judgment. Appropriations for the programs and their cost in personnel, equipment, travel and other expenses, some of which were later the subject of the Executive Orders in question, were incorporated in House bill 888. This bill was considered by the body of the house and adopted, sent to the senate and amended, sent to a conference committee of the two bodies, adopted by both, and approved by the Governor as Laws 1973, ch. 376.

The role of the General Court in regard to these appropriations is not then at an end. RSA 9:13-27 (Supp. 1973) provide means by which the expenditure of these appropriations can be monitored by that body through designated agencies and officers. The appropriations are to be made available for expenditure by each department on July 1, 1973. § 10. "No State official, commissioner, trustee, or other person having control of public funds appropriated by the general court shall use any part of such funds for any other purpose than that for which they were appropriated, or expend any money ... in excess of the amount voted by the legislature." § 19. A fiscal committee of the legislature and the office of legislative budget assistant have been established to supervise

fiscal matters during the legislative session and the interim between sessions. RSA 14:30, 30-a. They can conduct post-audits of department accounts and undertake research and investigation and make analyses in regard to financial matters. RSA 14:31. It is clear from the foregoing that the power of the General Court to make appropriations for State departments and to monitor their expenditure is an established legislative function under the constitution and statutes.

Prior to its amendment in 1966, article 41 of the State constitution which relates to executive powers of the Governor read as follows: "There shall be a supreme executive magistrate who shall be styled the Governor of the State of New Hampshire, and whose title shall be His Excellency." The 1966 amendment added in pertinent part the following: "The executive power of the state is vested in the governor. The governor shall be responsible for the faithful execution of the laws. He may, by appropriate court action or proceeding brought in the name of the state, enforce compliance with any constitutional or legislative mandate, or restrain violation of any constitutional or legislative power, duty, or right, by any officer, department or agency of the state."

This amendment was proposed and adopted for submission to the voters by a constitutional convention held in 1964. The journal recording those proceedings is illuminating on whether it was intended to endow the Governor with the power and duty to interpose himself in the expenditure of the legislative appropriations by the departments of the State. As originally proposed to the convention the amendment would have contained the following sentence: "Each principal executive department shall be under the supervision of the Governor." A motion to strike out this sentence was made and in the debate which followed the sponsor of the motion argued that if the sentence stayed in "the Governor will have the power to tell us [department heads] who to hire and who to fire. You cannot run a department on that basis." N.H. Jour. of Const. Conv. 289 (1964). Another delegate stated "it was

not the intent of the Committee in any way whatsoever to give the governor authority to set policy or to interfere in any way with those commissions who are properly doing their job." *Id.* at 290. The amendment proposed was approved, the sentence in question was stricken and the amended resolution was approved by the convention and later adopted by the voters in its present form. *Id.* at 292. This legislative history leads to the conclusion that the Executive Orders in question were not authorized by article 41, part II of our constitution as they have the effect which the framers of the amendment expressly rejected. The language of part II, article 41 as amended states clearly when and how the Governor can exercise the powers it granted and there is no claim that the Executive Orders were occasioned by any failure in "the faithful execution of the laws".

Insofar as these Executive Orders purport to prevent the expenditure of appropriations made for the hiring of new personnel or the purchase of automobiles they would have the effect of a line item veto. A resolution proposing a constitutional amendment authorizing the Governor "to strike out or reduce items in an appropriation" while approving others failed to be adopted by the convention. N.H. Jour. of Const. Conv. 105 (1964). If such power were to be given to the Governor his veto could be overruled by the legislature in the usual manner. If constitutionally authorized these Executive Orders would have a more drastic effect than a line item veto because there is no established means by which the legislature could nullify them.

Prior to 1957, R.L. 23:10 and 11 provided that appropriations should not be available for expenditure by any department until quarterly allotments had been approved by the Governor. The General Court, however, removed this power from the Governor in 1957 (Laws 1957, 112:1) and made the appropriations available on July 1, to be expended over the fiscal year as the department heads deemed necessary for the proper operation of their departments. RSA 9:10.

The legislature has authorized the intervention of the Governor in the process of the expenditure of appropriations by the State departments in limited specific instances. RSA 9:11 provides that if a monthly report of the director of the division of accounts indicates that a department is spending at a rate which will deplete its appropriation before the end of the fiscal year a report is to be made to the Governor who may after investigation order the department head to reduce expenditures. It is not sought to sustain these Executive Orders under this provision. RSA 9:12 which gives the Governor the authority to investigate the management of State funds by departments and "within the scope of the powers possessed by him" to order action to bring about increased economy and efficiency cannot be interpreted to confer additional powers beyond those already possessed under other grants of authority.

RSA 9:13-c provides that if the director of accounts should determine that during three consecutive months there has occurred such a decline in state revenues as would, if continued, cause a serious deficit in the total budget, he is to report this fact to the Governor. "On receipt of such report the governor may, with the advice and consent of the advisory budget control committee, order reductions in rates of expenditures within all or any departments of state government, so that such decline in revenue will not result in the incurrence of further state debt." There is no claim of reliance on this authority.

We find no constitutional or statutory authority granted to the Governor to support the Executive Orders in question since they contravene the legislative intent expressed by the appropriations made by Laws 1973, ch. 376 for the hiring of new personnel and the purchase of automobiles. We hold them invalid. Insofar as the Executive Orders relate to the classified personnel of the State they contravene the powers of the legislature granted by the constitution and exercised by enactments in chapters 98, 98-A, 98-B, 98-C, 98-D and 99 of the *Revised Statutes Annotated.* We hold that the Executive Orders relating thereto are beyond the powers of the Governor and are invalid.

Although plaintiffs' petition seeks an order enjoining the Governor from enforcing these Executive Orders, we do not recommend or issue such an injunction. *See Tirrell v. Johnston,* 86 N.H. 530, 532, 171 A. 641, 642 (1934).

*Petition for declaratory judgment granted.*

All concurred.