Merrimack
No. 2010-436

NEW HAMPSHIRE HEALTH CARE ASSOCIATION & a.

v.

GOVERNOR & a.

Argued: December 9, 2010
Opinion Issued: January 21, 2011

380

*Devine, Millimet & Branch, P.A.*, of Manchester (*Daniel E. Will & a.* on the brief, and *Mr. Will* orally), for the petitioners.

*Michael A. Delaney*, attorney general (*Laura E. B. Lombardi*, assistant attorney general, and *Karen A. Schlitzer*, assistant attorney general, on the brief, and *Ms. Schlitzer* orally), for the respondents.

DALIANIS, C.J. The petitioners, New Hampshire Health Care Association (NHHCA), Genesis Pleasant View, Villa Crest and Greenbriar Terrace

Healthcare, appeal an order of the Superior Court (*Smukler*, J.) ruling that the respondents, Governor John Lynch and the Commissioner of the New Hampshire Department of Health and Human Services (DHHS), did not act unconstitutionally by reducing DHHS expenditures for fiscal year 2008, which had the effect of eliminating certain payments the petitioners expected to receive. We affirm.

## I. Background

The record reveals the following facts. Petitioner NHHCA is the trade association that represents New Hampshire's private nursing homes. The majority of its sixty-three members provide care to Medicaid recipients. The other petitioners are individual nursing homes that also provide care to Medicaid recipients.

DHHS is responsible for administering the Medicaid program in New Hampshire. *Bel Air Assocs. v. N.H. Dep't of Health & Human Servs.*, 154 N.H. 228, 229 (2006) (*Bel Air I*). This program provides federal and state funding of medical care for individuals who cannot afford to pay their own medical costs. *Id.* In New Hampshire, the Medicaid program receives half of its funding from the federal government and half from the State and its counties. *Bel Air Assocs. v. N.H. Dep't of Health & Human Servs.*, 158 N.H. 104, 105 (2008) (*Bel Air II*).

DHHS establishes rates of reimbursement for nursing home providers of services to Medicaid-eligible persons prospectively, in accordance with the State Medicaid Plan and New Hampshire Administrative Rules, He-E Part 806. *See Bel Air I*, 154 N.H. at 230. The rates are set twice per year. Pursuant to DHHS's rate-setting methodology, "nursing homes are reimbursed on the basis of per diem, per resident rates which are determined by totaling five rate components, including capital costs." *Bel Air II*, 158 N.H. at 106; *see* N.H. ADMIN. RULES, He-E 806.31.

The legislature appropriates money in the biennial state budget for its share of the Medicaid nursing home reimbursement. When there is a gap between the legislative appropriation and the amount derived from the Medicaid reimbursement rates that DHHS calculates, DHHS reconciles it by using a "Budget Neutrality Factor" (BNF) that reduces the Medicaid reimbursement rate by a flat percentage. *See* RSA 9:19 (2003) (prohibiting state agencies from spending money "in excess of the amount voted by the legislature"); *see also* N.H. ADMIN. RULES, He-E 806.31(j)(3) (facility-specific per diem rates are subject to budget neutrality provision), He-E 806.31(p) (budget neutrality provision). As a result of the BNF, the amount of DHHS nursing home appropriations that lapse to the general fund at the end of the fiscal year may increase. *See* RSA 9:18 (Supp. 2010) (pertaining to lapsed appropriations).

The petitioners claim that, historically, DHHS has manipulated the BNF "to create considerable surpluses of funds that would have been paid out as Medicaid reimbursement rates to nursing homes had the BNF been calculated . . . to achieve true budget neutrality." They allege: "Rather than using the BNF to tie the rates to the appropriation, DHHS instead was utilizing [it] . . . to deprive the nursing homes of Medicaid funds so as to be able to claim a surplus." The State counters that any such surplus was not intentionally created, explaining that "[b]ecause reimbursement rates are based upon assumptions regarding *future* utilization, it necessarily follows that there will be a surplus of funds at the end of the fiscal year if actual utilization is below the predicted amount."

In June 2007, in an apparent effort to address DHHS's use of the BNF, the legislature enacted Laws 2007, 129:1 as a footnote to the operating budget for the appropriation to DHHS. Laws 2007, 129:1 provided, in pertinent part:

> The appropriation in class 90 [Nursing Services] for the fiscal year ending June 30, 2007 shall be non-lapsing. Any balance remaining at the end of June 30, 2007 shall be paid to nursing homes as supplemental rates no later than October 1, 2007. The supplemental rates shall be based on the current rate setting methodology. The commissioner shall file a report with the legislative fiscal committee by October 1, 2007 which details the balance carried forward from fiscal year 2007 and the amounts to be paid as supplemental rates.

In 2008, as part of a bill that required certain operating budget reductions, the legislature amended Laws 2007, 129:1 to "[p]ermit [the] prior appropriation to the department of health and human services for nursing services to lapse on June 30, 2009." Senate Bill 321, *available at* http://www.gencourt.state.nh.us/legislation/2008/SB0321.html. As amended, this provision now concludes with the following sentence: "If such funds are not expended by June 30, 2009, they shall lapse to the appropriate funds." Laws 2008, 296:18.

The petitioners received no payments authorized by Laws 2007, 129:1 and Laws 2008, 296:18. DHHS took the position that it could not pay the supplemental rates without first receiving approval from the federal government to amend the State's Medicaid Plan. DHHS received federal approval to amend the State's Medicaid Plan on November 24, 2008. The approved amendment provided:

12a. *Supplemental Payment*
A one-time supplemental payment shall be paid as supplemental rates for the remaining encumbered balance of $8,868,563 from

the nursing facility appropriation for the fiscal year ending June 30, 2007. The methodology for this payment will be to make a supplemental distribution in [State fiscal year] 2009 to the New Hampshire non-state government owned and privately owned licensed nursing facilities based upon the percentage of paid claims for each of these facilit[ies] with dates of services for the period of July 1 to October 31, 2008.

Three days earlier, however, on November 21, 2008, Governor Lynch issued Executive Order 2008-10, which, pursuant to RSA 9:16-b (2003) and Part II, Article 41 of the New Hampshire Constitution, directed a reduction in executive branch expenditures. The Governor issued Executive Order 2008-10 after determining "that the budgeted state revenues [were] insufficient to fund state budgeted expenditures as authorized by Chapter 262, N.H. Laws of 2007" and after obtaining approval from the legislative fiscal committee. See RSA 14:30-a (Supp. 2010).

Executive Order 2008-10 reduced the planned expenditures of numerous state agencies and departments for the fiscal year ending June 30, 2009. DHHS's expenditures were reduced by $25,361,511. DHHS accomplished this reduction, in part, by eliminating $2,217,141 in state payments, $2,217,141 in county payments, and $4,434,251 in federal payments that otherwise would have been made to the petitioners pursuant to Laws 2007, 129:1 and Laws 2008, 296:18, an amount that aggregates to $8,868,563.

In May 2009, the petitioners brought the instant petition seeking declaratory relief, injunctive relief and a writ of mandamus. In June 2009, the petitioners moved for a preliminary injunction, which the trial court granted, enjoining the State from allowing the $8.8 million "surplus" funds to lapse to the general fund. Thereafter the parties filed cross-motions for partial summary judgment. The trial court granted the cross-motion filed by the respondents and denied that filed by the petitioners, ruling that the Governor and DHHS did not act unconstitutionally by reducing DHHS's planned expenditures for fiscal year 2008. This appeal followed.

## II. Analysis

We review the trial court's rulings on summary judgment by considering the affidavits and other evidence in the light most favorable to the non-moving party. See S. N.H. Med. Ctr. v. Hayes, 159 N.H. 711, 715 (2010). If this review does not reveal any genuine issues of material fact, i.e., facts that would affect the outcome of the litigation, and if the moving party is entitled to judgment as a matter of law, we will affirm. Id. We review the trial court's application of law to fact de novo. Id.

*A. RSA 9:16-b*

The petitioners first challenge RSA 9:16-b, the statute under which the Governor promulgated Executive Order 2008-10. They argue that RSA 9:16-b is facially unconstitutional because it grants the Governor a "line item veto" in violation of the Separation of Powers and Presentment Clauses of the State Constitution. *See* N.H. CONST. pt. I, art. 37, pt. II, art. 44. They assert that RSA 9:16-b is unconstitutional as applied because it allowed the Governor to contravene the legislature's express mandate in Laws 2007, 129:1 and Laws 2008, 296:18. They contend that because RSA 9:16-b is unconstitutional, Executive Order 2008-10 is void *ab initio. See Claremont School Dist. v. Governor (Costs and Attorney's Fees)*, 144 N.H. 590, 593 (1999).

*1. Facial Challenge*

■ We first address the petitioner's facial challenge to RSA 9:16-b. The constitutionality of a statute is a question of law, which we review *de novo. Akins v. Sec'y of State*, 154 N.H. 67, 70 (2006). "In reviewing a legislative act, we presume it to be constitutional and will not declare it invalid except upon inescapable grounds." *Baines v. N.H. Senate President*, 152 N.H. 124, 133 (2005) (quotation omitted). This means that "we will not hold a statute to be unconstitutional unless a clear and substantial conflict exists between it and the constitution." *Id.* (quotation omitted). It also means that "[w]hen doubts exist as to the constitutionality of a statute, those doubts must be resolved in favor of its constitutionality." *Bd. of Trustees of N.H. Judicial Ret. Plan v. Sec'y of State*, 161 N.H. 49, 53 (2010). "The party challenging a statute's constitutionality bears the burden of proof." *Tuttle v. N.H. Med. Malpractice Joint Underwriting Assoc.*, 159 N.H. 627, 640 (2010) (quotation omitted).

In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *First Berkshire Bus. Trust v. Comm'r, N.H. Dep't of Revenue Admin.*, 161 N.H. 176, 179-80 (2010). We review the trial court's statutory interpretation *de novo. Id.* When examining the language of a statute, we ascribe the plain and ordinary meaning to the words used. *Id.* We read words or phrases not in isolation, but in the context of the entire statute and the entire statutory scheme. *Id.* When the language of a statute is plain and unambiguous, we do not look beyond it for further indications of legislative intent. *Id.*

*a. Separation of Powers*

Part I, Article 37 of the State Constitution provides:

In the government of this state, the three essential powers thereof, to wit, the legislative, executive, and judicial, ought to be kept as separate from, and independent of, each other, as the nature of a free government will admit, or as is consistent with that chain of connection that binds the whole fabric of the constitution in one indissoluble bond of union and amity.

■ Part I, Article 37 is a "provision of interrelation." *Ferretti v. Jackson*, 88 N.H. 296, 299 (1936). "Unlike most state constitutions the language of the New Hampshire Constitution recognizes that separation of powers in a workable government cannot be absolute." *Opinion of the Justices*, 110 N.H. 359, 362 (1970) (citation omitted). *But see, e.g.*, FLA. CONST. art. II, § 3 ("The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein."). Part I, Article 37 "contemplates no absolute fixation and rigidity of powers between the three great departments of government." *Ferretti*, 88 N.H. at 299. Instead, it expressly recognizes that, as a practical matter, "there must be some overlapping" among the three branches of government and that "the erection of impenetrable barriers" among them is not required. *Opinion of the Justices*, 110 N.H. at 363 (quotation omitted). Thus, the New Hampshire Separation of Powers Clause "is violated only when one branch usurps an essential power of another." *Duquette v. Warden, N.H. State Prison*, 154 N.H. 737, 747 (2007).

■ Moreover, unlike the construction given to separation of powers clauses by courts in other jurisdictions, *see* 1 N. SINGER & J.D. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 3.7, at 74-76 (7th ed. 2010), we give Part I, Article 37 "a practical construction." *Opinion of the Justices*, 110 N.H. at 363 (quotation omitted).

■ The instant case concerns the constitutional powers of the legislative and executive branches. Part II, Article 2 of the State Constitution vests the legislature with the "supreme legislative power," which specifically comprises the power to make laws, name certain civil officers and define their duties, assess taxes, and make appropriations. *O'Neil v. Thomson*, 114 N.H. 155, 160 (1974); *see* N.H. CONST. pt. II, arts. 2, 5, 18, 56. Part II, Article 41 of the State Constitution vests the Governor with "[t]he executive power of the state." Under Part II, Article 41, the Governor is "responsible for the faithful execution of the laws." The intent of Part II, Article 41 of the State Constitution "is to impose a duty upon the Governor to carry out the legislative mandates and to enforce constitutional require-

ments." *Opinion of the Justices*, 116 N.H. 406, 412 (1976). The Governor is also responsible for governmental expenditures:

> No moneys shall be issued out of the treasury of this state, and disposed of . . . but by warrant under the hand of the governor . . . by and with the advice and consent of council, for the necessary support and defense of this state, and for the necessary protection and preservation of the inhabitants thereof, agreeably to the acts and resolves of the general court.

N.H. CONST. pt. II, art. 56. The purpose of Part II, Article 56 is to grant the Governor the power to ensure "that no payments . . . be made from the public treasury except for public purposes and in accordance with the law." *State v. Kimball*, 96 N.H. 377, 380 (1950) (quotation omitted). Pursuant to Part II, Article 56, the executive branch may expend public funds only to the extent, and for such purposes, as they may have been appropriated by the legislature. *See Petition of Strandell*, 132 N.H. 110, 115 (1989).

■ RSA 9:16-b allows the Governor to reduce executive branch expenditures under certain conditions. The petitioners argue that the statute unconstitutionally delegates to the executive branch the legislature's supreme legislative authority either to make law or appropriate money. We disagree. In our view, RSA 9:16-b concerns the executive's power to execute the legislative policy of maintaining a balanced budget and the executive's authority to spend state revenue, which we believe necessarily implies the obligation not to spend the money "foolishly or needlessly." *Opinion of the Justices to the Senate*, 376 N.E.2d 1217, 1223 (Mass. 1978). In our view, RSA 9:16-b does not involve the unconstitutional delegation of legislative power, but rather the permissible exercise of executive authority.

■ The New Hampshire Constitution specifically charges the legislative branch with appropriating and the executive branch with spending state revenue, but is silent as to whether expenditures may exceed appropriations. In other words, our constitution, unlike some others, does not require a balanced budget. *See, e.g.*, MASS. CONST. amend. art. 63, § 2, as amended by amend. art. 107. The legislature, however, has decided that a balanced budget *is* required and has enacted various statutes to accomplish this. *See* RSA ch. 9 (2003 & Supp. 2010).

For instance, RSA 9:8-b (2003) requires the adoption of a balanced budget. It prohibits the adoption of "an operating budget for any fund, or any other legislation" that "provides for appropriations, which exceed the state's total estimated revenues." RSA 9:8-b. If the state's estimated revenues as set forth in the budget "plus the estimated amounts in the treasury at the close of the year in progress" are less than the aggregate

recommended expenditures, then the legislature must adopt a budget "in which such deficit shall be met." *Id.* Additionally, RSA 9:3, I(c) (Supp. 2010) requires the Governor's budget message to include recommendations for meeting a budget deficit, should one exist. With regard to expenditures, RSA 9:19 precludes any person having control of public funds appropriated by the legislature to "expend any money or make any contract or bargain, or in any way bind the state in excess of the amount voted by the legislature."

RSA chapter 9 allows the executive branch to balance the budget by transferring appropriations or ordering reductions in expenditures. RSA 9:16-a (Supp. 2010), and RSA 9:17 (Supp. 2010) authorize certain transfers of appropriations within the limitations set forth in RSA 9:17-a (Supp. 2010). For instance, under RSA 9:16-a, executive branch agencies may transfer funds; however, any transfer of $2,500 or more requires prior approval of the legislature's fiscal committee and the Governor and Council. Additionally, RSA 9:17 allows the Governor and Council, with the prior approval of the fiscal committee, to authorize the commissioner of administrative services "to make such transfers of appropriation items and changes in allocation of funds available for operational purposes within any division or functional unit of a department or institution as may be necessary or desirable to best carry out the purpose of such division or functional unit."

RSA 9:13-e (2003) concerns transfers from the "revenue stabilization reserve account." RSA 9:13-e, III provides that "[i]n the event of a general fund operating budget deficit at the close of any fiscal biennium," the comptroller must notify the legislative fiscal committee and Governor of the deficit and request that sufficient funds, if available, be transferred from the revenue stabilization reserve account to eliminate the deficit.

The executive branch is allowed to reduce executive branch expenditures under RSA 9:11 (2003) and RSA 9:16-b. *See* RSA 9:1 (2003) (defining the term "department" as "any executive department," and specifically excluding from the definition "the legislature and the state judicial branch"). RSA 9:11 requires the director of the division of accounting services to report monthly to each agency the total amount expended during the prior month and the accumulated amount expended to date from July 1. "Whenever it appears that a department is spending at a rate which will deplete its appropriation before June 30," the director shall report this immediately to the Governor "who shall thereupon investigate and may, if necessary, order the department head to reduce expenditures in proportion to the balance available and the remaining time in the fiscal year." RSA 9:11. If the Governor makes such an order, the director of the division of accounting services "shall establish a limit of expenditures for the department and

shall not allow any expenditure . . . in excess of said limit unless and until said order has been modified by the governor." *Id.*

RSA 9:16-b provides:

I. Notwithstanding any other provision of law, the governor may, with the prior approval of the fiscal committee, order reductions in any or all expenditure classes within any or all departments, as defined in RSA 9:1, if he determines at any time during the fiscal year that:

(a) Projected state revenues will be insufficient to maintain a balanced budget and that the likelihood of a serious deficit exists; or

(b) The actual lapse for each fiscal year is not going to equal the level estimated in the forecast of funds, unappropriated surplus, as issued by the legislative budget assistant.

II. The governor shall make available a summary report every 60 days to the presiding officers and to the chairman of the fiscal committee about any actions under this section.

█ The above provisions charge the executive branch with maintaining a balanced budget. Under the legislature's scheme, as set forth in RSA chapter 9, the legislature is responsible for adopting a balanced budget, and the executive branch is responsible for ensuring that it remains balanced during the biennium.

█ Contrary to the petitioners' contentions, therefore, RSA 9:16-b does not involve the delegation of supreme legislative power, but rather the exercise of the executive branch's constitutional authority to carry out faithfully legislative mandates. *See* N.H. CONST. pt. II, art. 41; *Opinion of the Justices*, 116 N.H. at 412. RSA 9:16-b allows the Governor to order reductions only if he determines either that projected state revenues will be insufficient to maintain a balanced budget and a "serious deficit" is likely or that the actual lapse of funds for each fiscal year in the biennium is not going to equal the estimated lapse. RSA 9:16-b is only one of the statutory mechanisms the legislature has enacted to ensure that the state budget remains balanced.

█ Additionally, RSA 9:16-b concerns the Governor's constitutional authority to spend state revenue and his implied obligation not to do so recklessly. *See* N.H. CONST. pt. II, art. 56; *Opinion of the Justices*, 129 N.H. 714, 720 (1987) (recognizing executive's "discretion for expenditure of funds"); *see also Hunter v. State*, 865 A.2d 381, 390-91 (Vt. 2004); *Opinion*

*of the Justices to the Senate*, 376 N.E.2d at 1222-23. As the justices of the Massachusetts Supreme Judicial Court have explained:

> Inasmuch as it is the function of the executive branch to expend funds, it must be implied that the "supreme executive magistrate," as head of one of the three coequal branches of government, is not obliged to spend the money foolishly or needlessly. The executive branch is the organ of government charged with the responsibility of, and is normally the only branch capable of, having detailed and contemporaneous knowledge regarding spending decisions. The constitutional separation of powers and responsibilities, therefore, contemplates that the Governor be allowed some discretion to exercise his judgment not to spend money in a wasteful fashion, provided that he has determined reasonably that such a decision will not compromise the achievement of underlying legislative purposes and goals.

*Opinion of the Justices to the Senate*, 376 N.E.2d at 1222-23; *see Hunter*, 865 A.2d at 390-91. While the Governor may not circumvent the appropriations process "by withholding funds or otherwise failing to execute the law on the basis of his views regarding the social utility or wisdom of the law," this must be distinguished "from the exercise of executive judgment that the full legislative objectives can be accomplished by a lesser expenditure of funds than appropriated." *Opinion of the Justices to the Senate*, 376 N.E.2d at 1221-22. The Governor's constitutionally vested spending power must include the "exercise of discretion . . . to avoid wasteful expenditures in circumstances where the social purposes of the underlying legislation are not compromised." *Id.* at 1224; *see Opinion of the Justices*, 129 N.H. at 720.

We recognize that there is language in *Opinion of the Justices*, 118 N.H. 7, 16 (1978) that, at first glance, appears to conflict with this interpretation of the executive branch's spending power. In that case, the justices opined that the act of drawing a warrant pursuant to Part II, Article 56 was purely "ministerial." *Opinion of the Justices*, 118 N.H. at 16. They did so, however, in a different context from that presented here.

The issue in *Opinion of the Justices* was whether the legislature had usurped the Governor's constitutional authority by enacting as a footnote to the budget act a provision that conflicted with an executive order. *Id.* at 8, 12. In his executive order, the Governor had removed the authority for health planning and development from the department of health and welfare and had created a different agency, attached to the Governor's office, for the purpose of receiving and spending certain federal funds. *Id.* at 12. The legislature's footnote "returned the responsibility for . . . health planning . . . to the department of health and welfare by establishing within

the office of the commissioner of health and welfare an office of health planning and development and directing the Governor to designate the department of health and welfare as the responsible State agency" to receive and spend the federal funds. *Id.*

In deciding whether the legislature's footnote violated the separation of powers doctrine, the justices first opined that the legislature acted within its constitutional authority because this authority includes the power to name and settle civil officers within the state. *Id.* at 14. The justices further concluded that the legislature acted within its statutory authority because various statutes already gave the legislature the power to structure and spend federal funds. *Id.* at 15-16. Finally, the justices opined about whether the legislature violated Part II, Article 56 of the State Constitution:

> [T]he concern expressed in your resolution to us as to the "legal authority" under the warrant clause[, *see* N.H. CONST. pt. II, art. 56,] is answered by the fact that the questioned section renders the warranting function ministerial once the legislature has acted, as it has here. To hold otherwise would turn the warrant power into a line-item veto in contravention of N.H. CONST. pt. II, art. 44.

*Id.* at 16 (citations omitted).

The justices in *Opinion of the Justices*, therefore, were concerned with "the power of the Legislature to control the expenditure of funds in the sense that it determines the purposes for which expenditures may be made." *Opinion of the Justices to the Senate*, 376 N.E.2d at 1222 n.4. They were not concerned with "the power to control the extent of expenditures committed to a particular purpose." *Id.* When they opined that the Governor's spending power was merely "ministerial," they did so with respect to the inability of the Governor to spend state revenue on purposes other than those for which the legislature had appropriated money. *Opinion of the Justices*, 118 N.H. at 16. The Governor, they opined, could only spend money for the purposes set forth in the budget act. *Id.* Because the budget act included the legislature's footnote, creating a new office within the department of health and welfare, the Governor could spend state money only consistent with this purpose; he could not enforce his contrary executive orders because they had no appropriations attached to them. *See id.; see also Petition of Strandell*, 132 N.H. at 115.

The instant matter, by contrast, concerns the Governor's authority to control the extent of expenditures committed to a particular purpose. *See Opinion of the Justices to the Senate*, 376 N.E.2d at 1222 n.4. It involves the Governor's "constitutional prerogative to spend less than the full amount of an appropriation." *Id.* at 1223.

Moreover, although the justices referred to RSA 4:14 (2003), which empowers the Governor and makes it "his duty . . . to draw his warrant . . . [w]henever any money is due from the state to any person" because of a law, they did not discuss RSA 4:15 (2003), which requires gubernatorial approval before any executive branch appropriations may be expended. *See Opinion of the Justices*, 118 N.H. at 15, 16. Accordingly, upon careful review, we do not view *Opinion of the Justices*, 118 N.H. at 16, as conflicting authority. *Cf. Schoff v. City of Somersworth*, 137 N.H. 583, 586 (1993) ("[O]pinions of the justices are advisory opinions on the constitutionality of proposed legislation, and may not be entitled to weight equal to that given judicial decisions following full adversary process.").

We similarly do not view *O'Neil* as contrary authority, despite the petitioners' reliance upon it. *O'Neil* is factually distinguishable from the instant case.

At issue in *O'Neil* were three executive orders issued by the then Governor. The first required prior gubernatorial approval before any new classified employee could be hired. *O'Neil*, 114 N.H. at 157. The second banned the purchase of automobiles absent approval of an executive branch committee. *Id.* at 158. The third prohibited the transfer or promotion of any state employee with a labor grade higher than seventeen absent prior gubernatorial approval. *Id.* The Governor sought to justify the issuance of these orders solely under Part II, Article 41 of the State Constitution. *Id.*

We ruled that the statutory scheme in existence at that time did not grant the Governor the authority to issue these executive orders. *Id.* at 164. Nor did Part II, Article 41 of the State Constitution. *Id.* We observed that while "[t]he legislature has authorized the intervention of the Governor in the process of the expenditure of appropriations by the State departments in limited specific instances, . . . [t]here is no claim of reliance on this authority." *Id.*

In contrast to the executive orders at issue in *O'Neil*, Executive Order 2008-10 was issued pursuant to the Governor's specific statutory authority under RSA 9:16-b and as part of his constitutional authority to execute the legislature's statutory policy requiring a balanced budget. The Governor issued Executive Order 2008-10 specifically because doing so was necessary to achieve a balanced budget. This was not the case in *O'Neil. See id.* at 157-58.

We find support for our interpretation of RSA 9:16-b in *American Cancer Society v. Commissioner of Administration*, 769 N.E.2d 1248, 1250 (Mass. 2002), which involved a similar statute under which the executive branch, in response to revenue shortfalls, could reduce allotments for certain expenditures for which the legislature had previously made appropriations. The plaintiffs argued that the statute constituted "an unlawful

delegation of the Legislature's authority to appropriate funds." *American Cancer Soc.*, 769 N.E.2d at 1256. In rejecting this assertion, the Massachusetts Supreme Judicial Court explained that while the power to appropriate money is a legislative power, "the activity of spending money is essentially an executive task." *Id.* (quotation omitted). The statute at issue, the court concluded, "constitutes, not the legislative power of appropriation, but rather the executive power of expenditure." *Id.* It did not give the Governor "authority to set aside money from the treasury to be spent for a particular purpose," or "to direct that any money so appropriated be spent in a manner different from what the Legislature intended." *Id.* at 1257. Instead, it allowed the Governor to use his or her "executive judgment to reduce public expenditures in a time of true financial emergency," reflecting "a legislative determination that the Commonwealth's need to remain solvent overrides particular statements of social policy contained in . . . appropriation items." *Id.*

While there are differences between the Massachusetts and New Hampshire Constitutions, these differences serve only to reinforce our conclusion that RSA 9:16-b does not constitute the unconstitutional delegation of legislative authority. For instance, unlike the New Hampshire Constitution, which specifically vests the power to spend state revenue in the executive branch, the Massachusetts Constitution merely implies that spending money is an executive function. *See id.*; *see also Opinion of the Justices to the Senate*, 376 N.E.2d at 1221, 1222.

We find the Vermont Supreme Court's decision in *Hunter* instructive as well. That case involved a statute that delegated to a smaller legislative committee and the executive branch the authority to prepare and implement a deficit-prevention plan to address a budget shortfall when the legislature was not in session. *Hunter*, 865 A.2d at 384-85. After recognizing that "appropriation is a legislative power" and "spending is an executive power," the court viewed the statute as involving "shared powers at the intersection of the branches of government," and, thus, constitutional. *Id.* at 392; *see N.D. Council of School Adm'rs v. Sinner*, 458 N.W.2d 280, 284, 286 (N.D. 1990) (statute allowing director of budget to reduce general fund agencies' budgets if he finds that one or more enumerated factors are present did not give him "power to make a law, but only the authority to execute the law within the parameters set by the Legislature").

We are not persuaded by the out-of-state cases upon which the petitioners rely because they are materially distinguishable from the instant case. *See Chiles v. Children A, B, C, D, E, and F*, 589 So. 2d 260 (Fla. 1991); *State ex. rel. Schwartz v. Johnson*, 907 P.2d 1001 (N.M. 1995); *State v. Fairbanks North Star Borough*, 736 P.2d 1140 (Alaska 1987). For

instance, while the Florida Supreme Court in *Chiles* struck down a statute similar to RSA 9:16-b, it espoused a different view of the separation of powers doctrine from ours. *Chiles*, 589 So. 2d at 263-64. Under its view, "[t]he doctrine encompasses two fundamental prohibitions. The first is that no branch may encroach upon the powers of another. The second is that no branch may delegate to another branch its constitutionally assigned power." *Chiles*, 589 So. 2d at 264 (citation omitted). Our view, like that of the Vermont Supreme Court, is more "forgiving." *Hunter*, 865 A.2d at 392; *see Duquette*, 154 N.H. at 747. As the *Hunter* court explained:

> The focus of a separation of powers inquiry is not whether one branch of government is exercising certain powers that may in some way pertain to another branch, but whether the power exercised so encroaches upon another branch's power as to usurp from that branch its constitutionally defined function. As stated by James Madison, "where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free Constitution are subverted."

*Hunter*, 865 A.2d at 391 (quotation omitted); *see Duquette*, 154 N.H. at 747 (explaining that separation of powers doctrine is violated only when one branch usurps essential power of another).

The Alaska Supreme Court likewise strictly interpreted the separation of powers doctrine in *Fairbanks North Star Borough*. The court observed that the separation of powers doctrine is implicit in the Alaska Constitution and is intended to "preclude the exercise of arbitrary power." *Fairbanks North Star Borough*, 736 P.2d at 1142 (quotation omitted). Quoting Justice Brandeis, the court noted that the purpose of the doctrine is "not to avoid friction, . . . but to save the people from autocracy." *Id.* (quotation omitted). Accordingly, the court focused upon whether the statute at issue, which purported to allow the Governor to direct withholding or reduce appropriations under certain statutorily prescribed conditions, "permits the arbitrary exercise of power." *Id.*

Finally, the New Mexico case upon which the petitioners rely is factually distinguishable. In that case, the Governor "amended the ten allotments remaining in th[e] fiscal year to reflect a two and one-half percent across-the-board reduction in total appropriations." *Johnson*, 907 P.2d at 1002. Unlike the Governor in this case, however, the Governor in *Johnson* did not act under existing statutory authority. *Id.* at 1004-05. Nor did he act because he anticipated a general fund deficit. *Id.* at 1002 n.1. Rather, he did so only "to encourage spending patterns that anticipate appropriation reductions from the legislature." *Id.* at 1002 (quotation omitted). *Johnson,*

in other words, is similar factually to *O'Neil*, 114 N.H. at 164. The *Johnson* court expressly declined to "consider or decide what constitutional or statutory authority resides in the executive to avoid a deficit," the precise question we face today. *Id.* at 1002 n.1.

### b. Presentment Clause

The petitioners' argument under the Separation of Powers Clause is closely related to their argument under the Presentment Clause. The Presentment Clause of the State Constitution provides:

> Every bill which shall have passed both houses of the general court, shall, before it becomes a law, be presented to the governor, if he approve, he shall sign it, but if not, he shall return it, with his objections, to that house in which it shall have originated, who shall enter the objections at large on their journal, and proceed to reconsider it; if after such reconsideration, two-thirds of that house shall agree to pass the bill, it shall be sent, together with such objections, to the other house, by which it shall likewise be reconsidered, and, if approved by two-thirds of that house, it shall become a law. But in all such cases the votes of both houses shall be determined by yeas and nays, and the names of persons, voting for or against the bill, shall be entered on the journal of each house respectively. If any bill shall not be returned by the governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it unless the legislature, by their adjournment, prevent its return, in which case it shall not be a law.

N.H. CONST. pt. II, art. 44.

 The petitioners contend that RSA 9:16-b violates Part II, Article 44 because it allows the Governor to "amend or repeal statutes" outside of the process contemplated in Part II, Article 44. This argument is premised upon the assumption that RSA 9:16-b involves making or repealing a law, an assumption we rejected in the above discussion. Contrary to the petitioners' assertions, "a reduction of expenditures does not constitute a veto." *University of Conn. Chapter AAUP v. Governor*, 512 A.2d 152, 156 (Conn. 1986). A veto is "the *refusal of assent* by the executive officer whose assent is necessary to perfect a law which has been passed by the legislative body." *Id.* Reducing an expenditure "is not a refusal to assent to an appropriations bill. Neither does [a] reduction delete or destroy the validity, legality, or effectiveness" of such a bill. *Id.*

While the petitioners assert that Laws 2009, 129:1 and Laws 2008, 296:18 were not appropriations bills, the record demonstrates that these laws

amended the operating budget for the appropriation to the department of health and human services, and, thus, were akin to appropriations bills. Accordingly, the petitioners' reliance upon Part II, Article 44 is misplaced.

### 2. As Applied Challenge

Having concluded that RSA 9:16-b is not facially unconstitutional, we next address the petitioners' as applied challenge. The petitioners assert that RSA 9:16-b is unconstitutional as applied because it allowed the Governor to abrogate "past due and owing obligations from prior years." They explain that applying RSA 9:16-b "to a current year appropriation does not offend a Legislative **mandate** of payment," and, thus, is constitutional. They argue that, by contrast, applying RSA 9:16-b to Laws 2007, 129:1 and Laws 2008, 296:18, "has the effect of using [the Governor's] **permissive authority** . . . to contravene an **express mandate**," which, they assert, violates the separation of powers doctrine. *See* N.H. CONST. pt. II, art. 41; *Opinion of the Justices*, 116 N.H. at 412; *cf. Monier v. Gallen*, 120 N.H. 333, 336 (1980) (while Governor may create executive branch agencies, "[t]he exercise of that power . . . cannot exceed the Governor's constitutional authority or conflict with appropriate legislative mandates" (quotation and ellipsis omitted)).

The express mandate of payment to which the petitioners refer is as follows: "Any balance remaining at the end of June 30, 2007 shall be paid to nursing homes as supplemental rates no later than October 1, 2007." Laws 2007, 129:1; Laws 2008, 296:18. The petitioners contend that the Governor's Executive Order 2008-10, issued pursuant to RSA 9:16-b, which reduced DHHS's expenditures and effectively eliminated payment of these supplemental rates, conflicted with this mandate, and, thus, was unconstitutional.

The petitioners' argument, however, is premised upon their assumption that the only legislative mandates at issue are contained in Laws 2007, 129:1 and Laws 2008, 296:18. To the contrary, as explained in the discussion above, the whole of RSA chapter 9 evinces a legislative mandate to adopt, implement and maintain a balanced budget. Thus, there are conflicting mandates — the mandate to keep the State's budget balanced and the mandate to pay the petitioners supplemental rates out of an unexpended, nonlapsing appropriation.

In this case, the Governor resolved the conflicting mandates by giving priority to balancing the budget. This is consistent with the plain language of RSA 9:16-b. By its plain language, RSA 9:16-b expressly allows the Governor to implement the legislature's policy of maintaining a balanced budget "*[n]otwithstanding any other provision of law to the contrary.*" RSA 9:16-b (emphasis added). RSA 9:16-b thus reflects the

legislature's determination that the State's "need to remain solvent" takes precedence over other laws. *American Cancer Soc.*, 769 N.E.2d at 1257. Accordingly, applying RSA 9:16-b to Laws 2007, 129:1 and Laws 2008, 296:18 was not unconstitutional, but was consonant with the legislature's intent as expressed in the plain language of RSA 9:16-b.

### B. Executive Order 2008-10

#### 1. Takings Clause

Alternatively, the petitioners challenge the constitutionality of Executive Order 2008-10 itself. They argue solely under the New Hampshire Constitution that Executive Order 2008-10 effected an unconstitutional taking. *See* N.H. CONST. pt. I, art. 12. They assert that they had a vested, protected property right to be paid supplemental rates pursuant to Laws 2007, 129:1 and Laws 2008, 296:18 and that Executive Order 2008-10 deprived them of this right without just compensation. We disagree.

The New Hampshire Constitution provides that "no part of a man's property shall be taken from him . . . without his own consent." N.H. CONST. pt. I, art. 12. In the absence of a vested property right, no taking for purposes of Part I, Article 12 of the State Constitution has occurred. *See Adams v. Bradshaw*, 135 N.H. 7, 14 (1991), *cert. denied*, 503 U.S. 960 (1992). "[T]o be vested, a right must be more than a mere expectation based on an anticipation of the continuance of existing law; it must have become a title, legal or equitable, to the present or future enforcement of a demand, or a legal exemption from the demand of another." *In the Matter of Goldman & Elliott*, 151 N.H. 770, 774 (2005) (quotation omitted). "A perfect vested right can be no other than such as is not doubtful, or depending on any contingency, but absolute, fixed and certain." *Id.* (quotation omitted).

Here, the petitioners had only an "anticipation of the continuance of existing law." *Id.* The petitioners' "right" to payment of supplemental rates was conditioned upon there being a "balance remaining at the end of June 30, 2007," Laws 2007, 129:1, *and* upon the funds being expended by June 30, 2009, lest they lapse, *see* Laws 2008, 296:18. Their right to the supplemental rates to which Laws 2007, 129:1 and Laws 2008, 296:18 referred, therefore, was not "absolute, fixed and certain," and was not entitled to constitutional protection as a vested property right. *Id.*

To support their claim to a vested property interest in the supplemental rate payment, the petitioners mistakenly rely upon *Tuttle*, 159 N.H. at 644-45. *Tuttle*, however, is distinguishable from the instant case. In *Tuttle* we addressed a claim by policyholders of the New Hampshire Medical Malpractice Joint Underwriting Association (JUA) that Laws 2009, 144:1,

which required the JUA to transfer $110 million to the State's general fund over a period of years, constituted a retrospective law that impaired the present policyholders' vested contractual rights in violation of Part I, Article 23 of the State Constitution. *Tuttle*, 159 N.H. at 633, 634. The petitioners in this case have not alleged any vested contractual rights. They have not claimed that the operating budget footnotes set forth in Laws 2007, 129:1 and Laws 2008, 296:18 created enforceable contractual rights. The "rights" they claim were created by statute and are limited by other statutes that allow the Governor to take the action he did. The vested rights at issue in *Tuttle* and those alleged here are, therefore, dissimilar.

To support their assertion that they had a vested right to be paid supplemental rates, the petitioners also rely upon law from the Second Circuit Court of Appeals. The Second Circuit has held that under New York law, a nursing home has a protectable property interest in *retaining* money previously paid to it "for services already performed in reliance on a duly promulgated [Medicaid] reimbursement rate." *Oberlander v. Perales*, 740 F.2d 116, 120 (2d Cir. 1984), *superseded by statute on other grounds, as stated by Senape v. Constantino*, 936 F.2d 687, 690 n.4 (2d Cir. 1991). This body of law is of no avail to the petitioners. The money they seek was not previously paid to them for services already performed in reliance upon a duly promulgated Medicaid reimbursement rate. Rather, it is money they hoped to receive in the future as supplemental rates for services they already performed and for which they were already paid under the duly promulgated Medicaid reimbursement rate.

Moreover, "[a] property interest in money owed for services performed in reliance on state reimbursement does not vest where no preexisting reliance is demonstrated." *Sutphin Pharmacy, Inc. v. Perales*, 770 F. Supp. 168, 173 (S.D.N.Y. 1991). In this case, the petitioners have not demonstrated that they provided services in reliance upon either Laws 2007, 129:1 or Laws 2008, 296:18. "On that point alone, [their] claim to a *vested* property interest in money paid for services already performed in reliance on a duly promulgated reimbursement rate founders." *Id.* at 173-74 (quotation omitted).

### 2. Procedural Due Process

The petitioners next assert that they were entitled to, and did not receive, adequate procedural due process before Executive Order 2008-10 was issued. Assuming, without deciding, that the petitioners adequately preserved this claim under both the State and Federal Constitutions, *see State v. Dellorfano*, 128 N.H. 628, 632 (1986); *N.H. Dep't of Envtl. Servs. v. Marino*, 155 N.H. 709, 718-19 (2007), we hold that it fails for the same reasons as their takings claim. The petitioners are not entitled to proce-

dural due process under either the State or Federal Constitution absent a constitutionally protected property interest. *See Appeal of Town of Bethlehem*, 154 N.H. 314, 327-29 (2006) (State Constitution); *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (Federal Constitution).

### 3. Supremacy Clause

 The petitioners next contend that Executive Order 2008-10 violates the Supremacy Clause of the Federal Constitution. The Supremacy Clause of Article VI of the Federal Constitution gives Congress the power to preempt state law. *Appeal of Union Tel. Co.*, 160 N.H. 309, 320 (2010). "Under the Supremacy Clause of the Federal Constitution, state law is preempted where: (1) Congress expresses an intent to displace state law; (2) Congress implicitly supplants state law by granting exclusive regulatory power in a particular field to the federal government; or (3) state and federal law actually conflict." *Id.* (quotation omitted). "An actual conflict exists when it is impossible for a private party to comply with both state and federal requirements or where state law stands as an obstacle to the accomplishments and execution of the full purpose and objective of Congress." *Id.* (quotation omitted).

The petitioners argue that Executive Order 2008-10 conflicts with portions of the Federal Medicaid Act, which impose substantive and procedural requirements the State must follow when establishing Medicaid reimbursement rates. *See* 42 U.S.C.A. § 1396a(a)(13)(A), (30)(A) (2003). 42 U.S.C.A. section 1396a(a)(13)(A) requires that reimbursement rates be established pursuant to a "public process" under which: (1) "proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published"; (2) "providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications"; (3) "final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published"; and (4) "in the case of hospitals, such rates take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs."

42 U.S.C.A. section 1396a(a)(30)(A) requires that reimbursement rates "are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area."

The petitioners' reliance upon these portions of the Federal Medicaid Act is misplaced. Executive Order 2008-10 did not establish or modify published reimbursement rates. Nor, for that matter, did Laws 2007, 129:1 and Laws 2008, 296:18, which specifically provided that the supplemental rates to which they referred were to be calculated according to the "current rate setting methodology." The rate setting methodology set forth in New Hampshire Administrative Rules, He-E Part 806 remained unchanged by these actions.

The petitioners also contend that Executive Order 2008-10 violated federal regulations, which require the State to amend its Medicaid Plan in the event of "[m]aterial changes in State law, organization, or policy, or in the State's operation of the Medicaid program." 42 C.F.R. § 430.12(c)(1)(ii) (2009); *see also* 42 C.F.R. § 430.10 (2009). They base this assertion upon the State's contention that it could not pay the supplemental rates to which Laws 2007, 129:1 and Laws 2008, 296:18 refer absent an amendment to the State's Medicaid Plan. The petitioners reason, "If the *payment* of the Laws 2007, 129:1 funds constituted a 'material change' in the State's operation of the Medicaid program, then the Governor's *elimination of the payment* unquestionably constituted a 'material change.'" The petitioners, however, have not provided any legal or record support for this assertion. The record on appeal shows that the federal government required the State to amend its Medicaid Plan so as to obtain federal financial participation in the one-time payment of the supplemental rates. Nothing in the record, however, demonstrates that the federal government has required a similar amendment now that the one-time payment of supplemental rates has been eliminated.

In light of our decision, we decline the petitioners' request that we order the trial court to issue a writ of mandamus compelling payment of the supplemental rates. Such an extraordinary writ will issue only when the petitioner has an apparent right to the requested relief. *Petition of CIGNA Healthcare*, 146 N.H. 683, 687 (2001). As we have determined that the petitioners have no right to the relief they seek, mandamus is not warranted.

*Affirmed.*

DUGGAN, HICKS and CONBOY, JJ., concurred.