Merrimack
No. 2013-496

JOHN DOE

v.

STATE OF NEW HAMPSHIRE

Argued: May 8, 2014
Opinion Issued: February 12, 2015

*Orr & Reno, P.A.*, of Concord (*William L. Chapman* on the brief and orally), and *New Hampshire Civil Liberties Union*, of Concord (*Gilles Bissonnette* on the brief), for the petitioner.

*Joseph A. Foster*, attorney general (*Dianne H. Martin*, attorney, on the brief and orally), for the State.

*Michael J. Sheehan*, of Concord, by brief, for Citizens for Criminal Justice Reform, as *amicus curiae*.

*Brennan Caron Lenehan & Iacopino*, of Manchester (*Michael J. Iacopino, Iryna N. Dore*, and *Jenna M. Bergeron* on the brief), for New Hampshire Association of Criminal Defense Lawyers, as *amicus curiae*.

LYNN, J. The petitioner, John Doe, appeals an order of the Superior Court (*McNamara*, J.) granting summary judgment for the respondent, the State of New Hampshire, on the petitioner's declaratory judgment action, which sought a ruling that RSA chapter 651-B is unconstitutional, as applied to him, because it violates the prohibition against retrospective laws and the Due Process Clause of the New Hampshire Constitution. *See* RSA ch. 651-B (2007 & Supp. 2014). We affirm in part, reverse in part, and remand.

I

There are no material facts in dispute. In 1987, the petitioner pleaded guilty to two counts of aggravated felonious sexual assault, *see* RSA 632-A:2 (Supp. 2014), which occurred in 1983 and 1984. The petitioner was sentenced to two and a half to five years imprisonment, which was deferred for two years. He was also placed on probation for four years. As part of his sentence, the petitioner was required to attend sex counseling, which he did weekly for two years. In August 1990, the petitioner's probation was terminated.

On January 1, 1994, the petitioner became subject to registration as a sex offender. *See* RSA 632-A:11-:19 (1993) (repealed and recodified at RSA 651-B:1-:12 by Laws 1996, 293:2). According to the petitioner, he was not aware of this requirement until 2004, but since then he has complied with all of the registration requirements. As required, the petitioner reports in person to the local police station four times per year to register. The station is one mile from his residence and because the petitioner is disabled, he must use a scooter or take public transportation to get there. When he

reports, he does so in the public lobby of the police station. In addition, twice a year a uniformed police officer goes to the petitioner's residence, unannounced, to verify that he resides there.

In 2005, the petitioner planned to move into his son's home. Because of his status as a registered sex offender, residents of his son's neighborhood petitioned the landlord to prevent the petitioner from moving in. The petitioner did not move in with his son. Since an injury in 2006, the petitioner has been permanently disabled. He must use a cane to get around and he must use a scooter to travel any significant distance. Due to his injury and subsequent disability, the petitioner's physicians have recommended that he obtain public housing in order to meet his medical needs. The petitioner sought housing through the Manchester Housing Authority and was initially approved. However, his approval was revoked because of his status as a registered sex offender.[1] His physicians continue to recommend public housing options, but the petitioner is unable to obtain such housing because of his status, about which he is embarrassed to tell his doctors. He currently lives in a single room in a boarding house.

The petitioner sought a declaratory judgment in the superior court that RSA chapter 651-B (the act) is unconstitutional as applied to him because it violates the prohibition against retrospective laws and the Due Process Clause of the New Hampshire Constitution. The parties agreed that there were no facts in dispute, and each side moved for summary judgment. After a hearing, the trial court granted the State's motion for summary judgment. The trial court ruled that the act did not violate the *Ex Post Facto* Clause[2] because the legislature intended the act to be regulatory, and any punitive effects of the act did not override this regulatory purpose by the clearest proof. The trial court also stated that it could not find that the act had a punitive effect because the state's laws are presumed constitutional. The court also held that the act did not violate the petitioner's procedural or substantive due process rights. This appeal followed.

## II

■ On appeal, the petitioner challenges the constitutionality of RSA chapter 651-B, as applied to him, on two grounds. First, he argues that the act violates Part I, Article 23 of the New Hampshire Constitution, which prohibits retrospective laws. Second, he argues that the act violates his procedural due process rights as guaranteed by Part I, Article 15 of the New Hampshire Constitution. We review a trial court's ruling on the

---

[1] *See* 42 U.S.C. § 13663 (2012) (prohibiting public housing for "an individual who is subject to a lifetime registration requirement under a State sex offender registration program").

[2] The trial court used the phrase "*ex post facto*" when referring to the prohibition against retrospective laws. The two terms are often used interchangeably.

constitutionality of a statute *de novo*. *See In the Matter of Bordalo & Carter,* 164 N.H. 310, 314 (2012). The party challenging the constitutionality of a statute bears the burden of demonstrating that it is unconstitutional. *New Hampshire Health Care Assoc. v. Governor,* 161 N.H. 378, 385 (2011). "In reviewing a legislative act, we presume it to be constitutional and will not declare it invalid except upon inescapable grounds." *Id.* (quotation omitted). "[W]hen doubts exist as to the constitutionality of a statute, those doubts must be resolved in favor of its constitutionality." *Id.* (quotation omitted).

## III

The New Hampshire Legislature first enacted the state's sex offender registry law in 1992 by adding sections 11 through 19 to RSA chapter 632-A. Laws 1992, 213:1. In 1993, the act was amended to apply to any sex offender, regardless of the date of conviction, who "completed his sentence not more than 6 years before the [law's] effective date." Laws 1993, 135:1, III. This version of the statute required all sex offenders to register with the department of safety (department), division of state police (division). Laws 1992, 213:1. For purposes of the act, "sexual offenders" were defined as persons who had been convicted of certain sexual assault offenses. *See id.* Registrants were required to report their current mailing addresses and places of residence or temporary domiciles to the local law enforcement agencies where they resided. Such report was to be made annually within 30 days after each anniversary of the date of release from custody following conviction or of the date of establishing residence in New Hampshire if convicted outside of the state. *Id.* Registrants also had to report within 30 days after any change of address or place of residence. *Id.* If a change in residence placed an offender in the jurisdiction of a different local law enforcement agency, in addition to registering with the new agency within 30 days, the offender also had to give written notice of his new address to the local law enforcement agency with which he last registered within 10 days. *Id.* Certain offenses required the offender to be registered for life, while others required the offender to be registered for ten years. *Id.* Negligent failure to register was a violation, and knowing failure to register was a misdemeanor. *Id.*

The information collected by local law enforcement was forwarded to the state police, who had the task of entering the information in the law enforcement name search (LENS) system. *Id.* The information was confidential and "available only to law enforcement officials and their authorized designees or to the individual requesting his own record in the LENS system." *Id.* Unauthorized disclosure of confidential information was a violation. *See id.*

This version of the act was challenged in *State v. Costello*, 138 N.H. 587 (1994). In that case, we held that the act did not violate the prohibition against retrospective laws because "[o]n its face the statute [did] not purport to be punitive but [was] merely regulatory, providing a means for law enforcement agencies in this State to share information regarding the whereabouts of convicted sexual offenders." *Id.* at 590. This determination was supported by the legislative history of the act. *Id.* We found that this regulatory purpose was manifest and "any punitive effect of the registration requirement [was] *de minimis*." *Id.* at 590-91. Since our decision in *Costello*, the act has been amended several times. The current act, its requirements, and its effects are significantly different from the act that we considered twenty years ago.[3]

In 1996 the legislature repealed RSA 632-A:11- :19 and enacted a new chapter — RSA 651-B. Laws 1996, 293:1, 2. In addition to sex offenders, "offenders against children" were now required to register.[4] Laws 1996, 293:1. Under the new act, information provided by registrants was no longer available only to law enforcement. Law enforcement agencies were given the right to notify schools, youth groups, day care centers, summer camps, libraries, or any other organizations where children gathered, about the names, addresses, offenses, methods of approach to victims, and profiles of previous victims of individuals convicted of certain violations. *See id.* Law enforcement agencies could also provide photographs of offenders to these organizations. *Id.* Aside from the enumerated organizations, however, the registration information remained confidential, and the organizations that were notified could use the information only to protect children in their charge; the information could not be used to notify the community at large. *Id.* An offender could prevent an agency from releasing his information if he obtained an order from the superior court, upon a showing, by clear and convincing evidence, that the offender's risk of reoffending was low. *See id.*

Two years later, the legislature repealed and re-enacted RSA 651-B:7. Laws 1998, 239:2. Under this new section, the registration information became publicly available. *Id.* The law also required the division to maintain

---

[3] Registration statutes in other states have followed parallel developments and have increased the registration and notification provisions of their sex offender registry schemes. For this reason, cases from other jurisdictions that examine earlier versions of these laws are not particularly helpful to our analysis of RSA chapter 651-B as it exists today.

[4] "Offender against children" included persons who were convicted of a violation or attempted violation of any of the following offenses where the victim was under the age of 18 at the time of the offense: kidnapping, criminal restraint, false imprisonment, prostitution, contributing to the delinquency of a minor, endangering the welfare of a child by soliciting sexual activity, child pornography, use of a child in obscene material, or the laws of another state that are the reasonable equivalents of these offenses. Laws 1996, 293:1.

a "separate list" that had to include: (1) names and addresses of registered individuals; (2) offenses for which they were convicted; (3) dates of their convictions; and (4) courts in which they were convicted. *Id.* The list could also include: (1) offenders' photographs or physical descriptions; (2) dates of offenders' other convictions and courts in which they were convicted; (3) information on the profiles of the victims; and (4) methods of approach utilized by the offenders. *Id.* The information contained on the "separate list" could become available to interested members of the public "upon request to the local law enforcement agency." *Id.* However, the act required that a record be kept of "the parties to whom information from the list has been disclosed." *Id.*

In 2001, registrants became required to report their mailing addresses and places of residence or temporary domicile within 30 days after each birthday instead of the date of release from custody following conviction. Laws 2000, 177:1, 5. Beginning in 2001, the "separate list" of offenders had to contain information about the offenders' outstanding arrest warrants. Laws 2000, 177:2, 5. In that same year, a knowing failure to register became a class B felony. Laws 2000, 177:4.

In 2002, the legislature granted authority to local law enforcement agencies to photograph, without the registrant's consent, any individual who was required to register. Laws 2002, 241:1. Also in 2002, the department received authority to make the "separate list" of offenders "available to interested members of the public through the use of the department's official public Internet access site." *Id.*

Beginning in 2003, offenders had to provide photographs taken by law enforcement agencies as part of their registration. Laws 2003, 316:1, 10. The division had to include these photographs on the "separate list" of offenders. Laws 2003, 316:3. The "separate list" was also now required to contain offenders' dates of birth. *Id.* Local law enforcement was no longer required to identify and maintain a record of the parties to whom the information from the registry was disclosed. Laws 2003, 316:2.

In 2005, offenders who were found not guilty by reason of insanity were made subject to the registration requirements. Laws 2005, 214:3. In 2006, the department was required to register sex offenders and offenders against children upon "receipt of information . . . concerning the disposition of any charges against any sex offender or offender against children." Laws 2006, 327:5. These amendments also gave law enforcement agencies the authority to "notify the public that an offender who [was] included on the public list . . . [was] residing in the community." Laws 2006, 327:11.

The requirements imposed on registrants were further increased in 2006. Offenders had to register in person. Laws 2006, 327:7. In addition to reporting at their birthdays, registrants had to report six months after

their birthdays. *Id.* The offenders also had to report within 5 days of their birthdays instead of 30 days. *Id.* Registrants were required to report their name, age, race, sex, date of birth, height, weight, hair and eye color, address of any permanent residence and address of any current temporary residence, within the state or out of the state, mailing address, date and place of any employment or schooling, and vehicle make, model, color, and license tag number. *Id.* The department was required to verify offenders' addresses by sending a letter, by certified non-forwarding mail, to the offenders twice a year, which the offenders had to sign and return within 10 business days of receipt. Laws 2006, 327:6. The department could choose to deliver the letters by "other means" if the offenders' mailing addresses were post office boxes. *Id.* The penalties for failure to register were amended: negligent and knowing failure to register remained a misdemeanor and a class B felony, respectively, while repeated knowing failure to register was made a class A felony. Laws 2006, 327:12.

We had occasion to address the registration law again in *Horner v. Governor*, 157 N.H. 400 (2008). However, we did not consider the entire act, but rather only RSA 651-B:11, which requires the collection of a sex offender registration fee. *Horner*, 157 N.H. at 401. We held that it was properly characterized as a fee and not a tax. *Id.* at 404. We also held that the fee did not violate the *Ex Post Facto* Clause of the New Hampshire Constitution because it was not imposed as a punishment, but rather to defray the costs of maintaining the registry, and because the fee was imposed at the time of registration and, therefore, occurred prospectively, not retrospectively. *Id.*

In 2008, the legislature created three tiers of registrant classification, based upon the crime for which the offender was convicted. *See* Laws 2008, 334:1. The requirement to register was expanded to include individuals guilty of conspiracy, solicitation, or as accomplices to sex offenses or offenses against children. *Id.* As of 2008, offenders were required to report: name, aliases, electronic mail addresses, and any internet messaging, chat, or other internet communication name identities; name, address, and date of any employment or schooling, and information about all places he or she generally worked, and any regular routes of travel; any professional licenses or certifications held; state of registration of any vehicle owned or regularly driven by the offender, and the place or places where such vehicles were regularly kept; any alias date of birth used by the offender; social security number; physical description to include identifying marks such as scars and tattoos; telephone numbers for both fixed location and cell phones; passport, travel, and immigration documents; and the name, address, and telephone number of any landlord, if the offender resided in rental property. Laws 2008, 334:4.

The department also was given authority to require that offenders submit: a photograph taken by the law enforcement agency at each required reporting; a DNA sample; a set of major case prints, including fingerprints and palm prints; and a photocopy of any valid driver's license or identification card. *Id.* Law enforcement did not need the consent of the registrant to obtain this information. *Id.* The 2008 iteration also permitted law enforcement agencies and the department to verify the address of any offender through in-person contact at the residence of the offender. Laws 2008, 323:11.

In 2010, it became a class A misdemeanor for certain offenders to initiate contact with a victim, except in cases where a prior relationship existed. Laws 2010, ch. 78. Registrants also had to report information about any water or air craft that they operated. *Id.*

Under the current version of the law, individuals are required to register if "charged with an offense or an attempt, conspiracy, solicitation, or as an accomplice to commit a sex offense or offense against a child" that resulted in one of the following outcomes:

(1) Conviction.

(2) A finding of not guilty by reason of insanity.

(3) An adjudication as a juvenile delinquent and the court at the time of the dispositional hearing finds, pursuant to RSA 169-B:19, that the juvenile is required to register.

(4) An adjudication of juvenile delinquency or its equivalent in another state or territory of the United States if the juvenile is required to register under the laws of that jurisdiction.

(5) An order committing the person as a sexually violent predator pursuant to RSA 135-E.

RSA 651-B:1, XI (Supp. 2014).

The act categorizes offenders into three tiers by the severity of the crime committed, with tier III being the most serious offenses. *See* RSA 651-B:1, VIII, IX, X (Supp. 2014). The petitioner here is a tier III offender. Tier III offenders must report to the local law enforcement agency "in person quarterly, within 5 business days after each anniversary of the offender's date of birth and every 3 months thereafter." RSA 651-B:4, I(a) (Supp. 2014). Tier I and II offenders must report semi-annually. RSA 651-B:4, I(b) (Supp. 2014). The department must verify each offender's address semi-annually, either in person or by sending a letter by certified non-forwarding mail. RSA 651-B:3, III (Supp. 2014). For each such verification, "the offender shall sign the address verification and return it to the officer, if the address verification was made in person, or to the department within 10

business days of receipt." *Id.* The local law enforcement agency, or the department, at its discretion, "may affirmatively verify the address of any offender within that agency's jurisdiction through in-person contact at the home or residence of the offender." RSA 651-B:3, IV (Supp. 2014).

Each time an offender reports, the offender must provide the following information:

(a) Name and any aliases.

(b) Address of any permanent residence and address of any current temporary residence, within the state or out-of-state, and mailing address. A post office box shall not be provided in lieu of a physical residential address. If the offender cannot provide a definite address, he or she shall provide information about all places where he or she habitually lives.

(c) Name, address, and date of any employment or schooling. For purposes of this section, the term "employment" includes volunteer work or work without remuneration. If the offender does not have a fixed place of work, he or she shall provide information about all places he or she generally works, and any regular routes of travel.

(d) Any professional licenses or certifications that authorize the offender to engage in an occupation or carry out a trade or business.

(e) Make, model, color, and license plate or registration number and state of registration of any vehicle, watercraft, or aircraft owned or regularly operated by the offender, and the place or places where such vehicles, watercraft, or aircraft are regularly kept.

(f) Date of birth, including any alias date of birth used by the offender.

(g) Social security number.

(h) Physical description to include identifying marks such as scars and tattoos.

(i) Telephone numbers for both fixed location and cell phones.

(j) Passport, travel, and immigration documents.

(k) The name, address, and phone number of any landlord, if the offender resides in rental property.

RSA 651-B:4, III (Supp. 2014). The offender must also provide "any online identifier such person uses or intends to use," including "electronic mail address, instant message screen name, user identification, user profile

information, and chat or other Internet communication name or identity information." RSA 651-B:4-a (Supp. 2014). The offender must "report any changes to an existing online identifier, or the creation of any new online identifier to law enforcement before using the online identifier." *Id.* At each reporting, the offender may be required to provide the following information:

(a) A photograph taken by the law enforcement agency each time the person is required to report to the law enforcement agency under this section.

(b) A DNA sample, if such sample has not already been provided.

(c) A set of major case prints, including fingerprints and palm prints of the offender.

(d) A photocopy of a valid driver's license or identification card issued to the offender. The consent of the registrant shall not be necessary to obtain this information. Such information may be used in the performance of any valid law enforcement function.

RSA 651-B:4, IV (Supp. 2014). All of the reported information is kept by law enforcement in the SOR (sex offender registry) system. If there is a change in any of the information that the offender is required to report, the offender "shall give written notification of the new information to the local law enforcement agency . . . within 5 business days of such change of information." RSA 651-B:5, I (Supp. 2014). If an offender "changes residence, employment, or schooling, the offender shall report in person to the local law enforcement agency having jurisdiction over the offender's previous place of residence, place of employment, or school within 5 business days." *Id.*

The act requires the division to keep a separate, public list of registered offenders. RSA 651-B:7, III(a) (Supp. 2014). The public list must include the following information:

(1) Offender's name, alias, age, race, sex, date of birth, height, weight, hair and eye color, and any other relevant physical description.

(2) Address of any permanent residence and address of any temporary residence, within the state or out-of-state.

(3) The offense for which the individual is required to register and the text of the provision of law defining the offense, and any other sex offense for which the individual has been convicted.

(4) The date and court of the adjudication on the offense for which the individual is registered.

(5) Outstanding arrest warrants, and the information listed [in paragraphs (1)-(3), above] for any sexual offender or offender against children who has not complied with the obligation to register under this chapter.

(6) Criminal history of the offender, including the date of all convictions and the status of parole, probation, or supervised release, and registration status.

(7) A photograph of the individual.

(8) The address of any place where the individual is or will be a student.

*Id.* The public list may also include, if available, "information on the profile of the victim of the individual's offense" and "the method of approach utilized by the individual." RSA 651-B:7, III(b) (Supp. 2014). The public list cannot include the identity of any victim, the offender's social security number, arrests of the offender that did not result in a conviction, or the name of any employer or school of the offender. RSA 651-B:7, III(c) (Supp. 2014).

The public list must be made available on the department's public internet website. RSA 651-B:7, IV(a) (Supp. 2014). The online list must be "available to the public in a manner that will permit the public to obtain relevant information for each sex offender by a single query for any given zip code or geographic radius set by the user." *Id.* Individuals may also obtain a copy of the public list by requesting it from the local law enforcement agency. *Id.* There is no record kept of who obtains the information. At their discretion, local police "may affirmatively notify the public that an offender who is included on the public list . . . is residing in the community." RSA 651-B:7, IV(c) (Supp. 2014). The local police may also notify certain officials of any school within its jurisdiction "of a new place of residence, a change of name, or a change of an alias, of a person required to be registered under this chapter." RSA 651-B:5, III (Supp. 2014).

All tier III offenders are registered with the department for life and remain on the public list for life. RSA 651-B:6, I, III(a)(1) (Supp. 2014). Tier II offenders are registered for life, but after 15 years may petition the superior court to be removed from the public list. RSA 651-B:6, I, III(a)(2) (Supp. 2014). Tier I offenders are registered for ten years, but may petition the superior court to be removed from the public list after five years. RSA 651-B:6, II, III(a)(3) (Supp. 2014). Before granting a petition to remove an offender from the public list, the court must "provide notice to the county attorney who prosecuted the case, the victim advocate, and the victim or victim's family, and permit those parties to be heard on the petition," and

the judge "shall consider the statements of the victim pursuant to this section when making a decision." RSA 651-B:6, III(b) (Supp. 2014).

An offender who is required to register, but negligently fails to comply with the requirements, is guilty of a misdemeanor. RSA 651-B:9, I (Supp. 2014). An offender who knowingly fails to comply is guilty of a class B felony. RSA 651-B:9, II (Supp. 2014). If the non-compliant registrant is a tier I offender, he or she "shall be required to register for an additional 10 years from the date of conviction for violating this paragraph." *Id.* If an offender again knowingly fails to comply, the offender is guilty of a class A felony. RSA 651-B:9, III (Supp. 2014). After repeated failures to comply, the offender is required to be registered for life, if he is not already subject to lifetime registration. *Id.* An offender who knowingly provides false information is guilty of a class B felony. RSA 651-B:9, VI (Supp. 2014). The department is required to "adopt rules, pursuant to RSA 541-A, relative to forms and procedures for the administration of this chapter." RSA 651-B:8 (2007).

## IV

■ The petitioner argues that RSA chapter 651-B is unconstitutional as applied to him because it violates the *Ex Post Facto* Clause of the New Hampshire Constitution. Part I, Article 23 of our constitution states that "retrospective laws are highly injurious, oppressive, and unjust. No such laws, therefore, should be made, either for the decision of civil causes, or the punishment of offenses." N.H. CONST. pt. I, art. 23. Since our early case of *Woart v. Winnick*, 3 N.H. 473 (1826), we have recognized that this clause has two distinct parts — one "for the decision of civil causes" and another "for the punishment of offences." *Woart*, 3 N.H. at 474. In *Woart*, we equated laws "for the punishment of offenses" with "what article I, section 10 of the National Constitution also prohibits under the name of an ex post facto law." *State v. Ballou*, 125 N.H. 304, 315 (1984) (Souter, J., dissenting). "Following this early case, when we speak of the application of article 23 to laws for 'the punishment of offenses,' we commonly speak of it simply as forbidding ex post facto laws, or ex post facto applications of laws." *Id.* "The protection afforded against *ex post facto* penal laws under both article I, section 10 of the Federal Constitution and part I, article 23 of the New Hampshire Constitution is the same." *Costello*, 138 N.H. at 589. As the petitioner brings his claims solely under the New Hampshire Constitution, we rely on federal law only to aid our analysis. *State v. Ball*, 124 N.H. 226, 231-33 (1983).

■ A law or its application is *ex post facto* if it: "makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action; or aggravates a crime, and makes it greater, than

it was when committed; or changes the punishment, and inflicts greater punishment, than the law annexed to the crime when committed." *State v. Matthews*, 157 N.H. 415, 418 (2008) (quotation omitted). "[T]he appropriate focus in *ex post facto* analysis is *not* on whether a law imposes disadvantages or additional burdens, but rather on whether it increases the punishment for or alters the elements of an offense, or changes the ultimate facts required to prove guilt." *Id.* at 420 (quotation omitted). Thus, even though a law might disadvantage an individual or group, it does not violate the *Ex Post Facto* Clause unless it also provides greater punishment. *Costello*, 138 N.H. at 589.

Although our above precedents establish an ultimate standard for resolving *ex post facto* claims, in applying this standard we find it helpful to adopt the analytical framework employed by the United States Supreme Court when it considered, and ultimately held that Alaska's sex offender registry did not violate the federal *Ex Post Facto* Clause. *See Smith v. Doe*, 538 U.S. 84 (2003). In that case, the Court adopted a well-established test from its double jeopardy jurisprudence. *See id.* at 92, 97. The first step in the analysis is to "ascertain whether the legislature meant the statute to establish civil proceedings." *Id.* at 92 (quotations omitted). "If the intention of the legislature was to impose punishment, that ends the inquiry." *Id.* "If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id.* (quotations and brackets omitted). In connection with this second step, "[b]ecause we ordinarily defer to the legislature's stated intent, only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (quotations and citation omitted). This framework is often referred to as the "intent-effects test." *See Wallace v. State*, 905 N.E.2d 371, 378 (Ind. 2009).

We have not utilized the intent-effects test for *ex post facto* analysis previously. However, like the Supreme Court, we have used the test a number of times for double jeopardy purposes, *see In re 1994 Chevrolet Cavalier*, 142 N.H. 705 (1998); *State v. Drewry*, 141 N.H. 514 (1996); *State v. Fitzgerald*, 137 N.H. 23 (1993), and it accords with our focus in *ex post facto* analysis on whether a law increases the punishment for an offense. The adoption of this test aids our analysis because a number of published opinions, including *Smith*, apply the same test. The petitioner here brings his claims under the State Constitution. Although the State and Federal Constitutions afford the same protection against *ex post facto* laws, *Costello* 138 N.H. at 589, "[w]hen State constitutional issues have been raised, this

court has a responsibility to make an independent determination of the protections afforded in the New Hampshire Constitution." *Ball*, 124 N.H. at 231.

## A

■ First, we analyze whether the legislature intended to adopt a regulatory or a punitive scheme. Initially, this is a question of statutory construction. *Smith*, 538 U.S. at 92. We look to the "statute's text and structure to determine the legislative objective," and ask whether the legislature indicated a preference for one label or another, either expressly or impliedly. *Id.* at 92-93. A statute may have an objective that is consistent with the purpose of the criminal justice system, but still not have a punitive intent. *Id.* at 94. Other factors, like the manner of enactment or enforcement procedures, are relevant to legislative intent. *Id.* However, the location of codification within a state's statutes is not dispositive of the issue of punitive intent. *Id.* at 95. Nor is the mechanism that the statute provides for creating procedural rules. *Id.*

Because we found in *Costello* that the original version of the sex offender registry was intended to be regulatory, *Costello*, 138 N.H. at 590, in analyzing the text and structure of RSA chapter 651-B, we must consider the intent of the amendments to the act since *Costello*, and determine whether they evidence a punitive intent. Neither the current act nor any of the post-*Costello* amendments include a section stating its purpose or objective, nor do they contain any findings by the legislature; thus, there is no express indication of whether the legislature intended the statutory scheme to be regulatory or punitive. The petitioner argues that the placement of the act entirely within the Criminal Code suggests a punitive intent, noting that the statute at issue in *Smith* was only partially codified in that state's criminal code. *See Smith*, 538 U.S. at 95. However, the act was entirely within the Criminal Code when we decided *Costello*. We did not find the act's placement dispositive of intent then, and we do not now.

■ In *Costello*, we held that the act served a regulatory purpose and that that intent was manifest. *Costello*, 138 N.H. at 590. Since then, numerous amendments have expanded the act's requirements. Although these changes may comport with the statute's regulatory purpose, as the State argues, the drastic increase in the burdens on registrants, which the petitioner contends far outstrip any regulatory purpose of the act, could suggest a punitive intent. We note, however, that the petitioner's assertion that the legislature's intent was punitive is undercut by the fact that the legislature has specifically indicated that the act applies retroactively. *See* Laws 2010, 78:9. Because the legislature presumably understands the well-established constitutional prohibition against applying punitive laws

retroactively, *cf. Blue Jay Realty Trust v. City of Franklin*, 132 N.H. 502, 512 (1989) (legislature is presumed to know pre-existing law upon which its enactments will operate), the existence of this provision is a strong indication that the legislature did not intend the act to be punitive.

Nonetheless, because the intent is not clear on the face of the statute, we turn to its legislative history. As discussed above, the act has been amended numerous times over the past two decades, leading to a voluminous legislative history. How we conceptualize this legislative history is important because there is not one continuous history of the various amendments over the past two decades. Rather, each amendment has its own history and, potentially, its own intent, which may or may not be the same as the intent behind earlier amendments.

The legislative history of the first amendments after *Costello* indicates a similar regulatory intent as the original act, and shows little evidence of a punitive purpose. The 1996 amendments allowed local law enforcement agencies to release information from the registry to certain organizations that care for children. Laws 1996, 293:1. The legislative history indicates that the legislature's purpose was to protect children by having "more eyes and ears in the community looking out" for them. RELATIVE TO THE CONFIDENTIALITY OF RECORDS AND INFORMATION COLLECTED PURSUANT TO THE REGISTRATION OF SEXUAL OFFENDERS: HEARING ON H.B. 1543 BEFORE THE SEN. COMM. ON JUDICIARY 2 (Apr. 8, 1996) (statement of Rep. Donna P. Sytek, bill sponsor). The legislature enacted this change with constitutional restrictions in mind and demonstrated a conscious effort to keep the act non-punitive. Representative Sytek testified, "We are trying to not add an additional punishment to those who committed sex crimes, because that would be unconstitutional." *Id.* at 3. The committee made an effort to narrowly tailor the law by applying it only to some offenders, by not extending the release of information to the community at large, and by providing a mechanism for offenders to prevent their information from being distributed if they did not pose a risk. *Id.* at 1-2. In 1998, the legislature made a separate list available to interested members of the public. Laws 1998, 239:2. This amendment intended to provide warning to citizens, N.H.S. JOUR. 796-97 (1998), and the potential punitive consequences were kept in check because the police had to keep a record of who obtained a copy of the list. *See* Laws 1998, 239:2.

The regulatory intent was still evident in 2002 when the legislature gave the department authority to put a list of offenders on its website: there was still the intent to protect children, and the legislature noted the need to modernize the list to better reach that goal. *See* RELATIVE TO THE AVAILABILITY OF INFORMATION ON THE REGISTRATION OF CERTAIN SEXUAL OFFENDERS: HEARING ON H.B. 1426 BEFORE THE SEN. COMM.

ON JUDICIARY 10-11 (Mar. 28, 2002) (statement of Rep. William Knowles). However, the legislative history also shows growing concern with the amendments. Some legislators expressed specific concerns that the new provisions would punish offenders and could have adverse effects on housing and employment. *Id.* at 14-18. Many were particularly concerned about publishing offenders' pictures online and the potential danger to which such postings could lead for those on the list. N.H.S. JOUR. 1014 (2003). Despite these concerns, there was a non-punitive purpose for posting pictures: a name on a list alone was often not enough to adequately warn citizens about an offender. *Id.* at 1014-15. Senator Debora Pignatelli stated that "having the photographs . . . would eliminate the possibility that someone who has not been an offender would be harassed because they happen to live at the same address." N.H.S. JOUR. 1261 (2002). Senator Pignatelli also mentioned that some offenders "have served their time in jail, but for committing these crimes against children, it really is a lifetime sentence, it isn't just your time in jail. Part of that lifetime sentence is to register every year with the local police station where you live." *Id.* These statements can be viewed as explicitly recognizing the punitive aspects of the registry as it is part of offenders' sentences, and impliedly recognizing punitive aspects in that offenders may be harassed.

Other legislators also suggested punitive aspects of the registry. In 2006, the legislature increased the burdens imposed by the act by requiring registrants to report in person multiple times a year and to provide more information. *See* Laws 2006, 327:7. This amendment also required police to verify the offenders' addresses. Laws 2006, 327:6. Senator Joseph Foster, then chair of the Judiciary Committee, stated that the amendment "toughens our registration system." N.H.S. JOUR. 826 (2006). Such language is often used to refer to penalties or punishment and not merely regulatory schemes. However, Senator Foster also said that the "point of this legislation is to protect children," *id.*, which indicates a non-punitive intent behind the amendment.

In 2008, the amendments increased the information that offenders were required to report, particularly information regarding internet use. *See* Laws 2008, 334:4. At the hearing before the Senate Judiciary Committee, Representative Lee Hammond questioned how being on a list enhanced public safety, and expressed concern about vigilantism and employment difficulties for those on the registry. *See* RELATIVE TO THE CLASSIFICATION OF CONVICTED SEX OFFENDERS AND OFFENDERS AGAINST CHILDREN AND REVISING THE PROVISIONS REQUIRING DNA TESTING OF CRIMINAL OFFENDERS: HEARING ON H.B. 1640-FN BEFORE THE SEN. COMM. ON JUDICIARY 11-12 (Apr. 15, 2008). Representative Hammond believed that

the scheme was too broad and that many non-dangerous people would be considered dangerous. *See id.* at 12. Senator Foster recognized the impact of the registry on offenders:

> What does that mean, when you're put in the registry? Well, in very material ways, your life's ruined; it's inalterably impacted. People who are on the registry are pariahs in our community and they're shunned. They're not able to go and do what most of us can do, like go to school events, volunteers [*sic*] in school, help out with their kids, and so forth. It's a very serious matter to be on the registry.

N.H.S. JOUR. 1143 (2008). Senator Robert Clegg also recognized the effects that could harm others, stating: "So we had a little bit of a concern, not for the predator, trust me, especially me, I couldn't care less about them; but it was about the employer . . . did we really want to put the stigma of here's a child sex predator that was working in there." *Id.* at 1148. These comments reflect a recognition of the stigma that results from being on the registry, but also indicate a lack of concern that offenders may suffer these effects. In a similar vein, during a hearing, Representative Cynthia Dokmo said that the fact that certain offenders were on the list for life with no chance of coming off was fair because "someone who commits a sexual crime needs to be punished." RELATIVE TO THE CLASSIFICATION OF CONVICTED SEX OFFENDERS AND OFFENDERS AGAINST CHILDREN AND REVISING THE PROVISIONS REQUIRING DNA TESTING OF CRIMINAL OFFENDERS: HEARING ON H.B. 1640-FN BEFORE THE SEN. COMM. ON JUDICIARY 3 (Apr. 15, 2008). Still, the legislature had the intent to protect children, and believed that such amendments were necessary to keep pace with technological advances and the reach of the internet. *See* N.H.S. JOUR. 703 (2008).

█ In sum, there are many indications that the legislature intended the act to be regulatory. There also are some indications of a punitive intent, especially when considering the more recent amendments. However, on balance, we cannot conclude that the legislature intended the act to be punitive. Given that we presume legislative enactments to be constitutional, *New Hampshire Health Care Assoc.*, 161 N.H. at 385, we conclude that the legislature intended RSA chapter 651-B to be regulatory and non-punitive.

## B

█ Next, we turn to the statute's effects and determine whether they are punitive. There are seven factors to be considered: (1) "[w]hether the sanction involves an affirmative disability or restraint;" (2) "whether it has

historically been regarded as a punishment;" (3) "whether it comes into play only on a finding of scienter;" (4) "whether its operation will promote the traditional aims of punishment — retribution and deterrence;" (5) "whether the behavior to which it applies is already a crime;" (6) whether there is an "alternative purpose to which it may rationally be connected;" and (7) "whether it appears excessive in relation to the alternative purpose." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963); *see also In re Chevy Cavalier*, 142 N.H. at 708-09. These factors are "neither exhaustive nor dispositive," *United States v. Ward*, 448 U.S. 242, 249 (1980), but are "useful guideposts," *Hudson v. United States*, 522 U.S. 93, 99 (1997). "This inquiry cannot be answered by looking at the effect of any single provision in the abstract." *State v. Theodosopoulos*, 123 N.H. 287, 290 (1983), *overruled on other grounds by State v. Reynolds*, 138 N.H. 519 (1994). Instead we must consider the effect of all the provisions and "their cumulative impact upon the defendant's rights." *Id.*

▇▇▇ Under the intent-effects test, the effects must override the statute's non-punitive intent "by clearest proof." *Smith*, 538 U.S. at 92. We do not find this standard to be meaningfully different from our standards for evaluating all constitutional challenges to a statute: the challenger bears the burden of demonstrating that the statute is unconstitutional and we "will not declare it invalid except upon inescapable grounds." *New Hampshire Health Care Assoc.*, 161 N.H. at 385 (quotation omitted).

The petitioner has brought his claim as an as-applied challenge. We recognize a distinction between facial and as-applied constitutional challenges. *State v. Hollenbeck*, 164 N.H. 154, 158 (2012). The State argues that because the petitioner brings an as-applied challenge, we should not consider certain provisions of the act that have not had an effect on him, such as, for example, the requirement that he provide vehicle information when he does not have a vehicle. The State's position is incorrect. Here, because all the act's requirements applicable to the petitioner impose mandatory requirements upon him, *e.g.*, if he had a vehicle, he would be required to furnish information about it to the authorities, we will consider all such provisions when we analyze the act's effects.

▇▇▇ The first factor to consider is whether the act involves an affirmative disability or restraint. *Mendoza-Martinez*, 372 U.S. at 168. The prototypical disability or restraint is prison. *See Smith*, 538 U.S. at 100. The Supreme Court, when examining Alaska's act, noted that it did not entail that type of physical restraint. *Id.* Registrants could move around, and live and work where they pleased with no supervision. *Id.* at 101. Although they had to report certain activities and changes in appearance, they were not prevented from doing those things nor did they need permission to do so.

*Id.* Because Alaska's act did not entail these kinds of mandatory provisions, the restraints involved were not like parole or probation. *Id.* The Court held that any effects on offenders' ability to do what they wanted to do resulted from the crimes they committed, a matter of public record, and not from the registry itself. *Id.*

There are two major differences between our statute and the Alaska statute at issue in *Smith.* First, the *Smith* Court made a point to mention that the act did not have an in-person reporting requirement, *id.,* a fact that the lower appellate court had erroneously relied upon in finding that the act imposed an affirmative disability. *Doe I v. Otte,* 259 F.3d 979, 990 (9th Cir. 2001), *rev'd sub nom. Smith v. Doe,* 538 U.S. 84 (2003). Under New Hampshire's act, however, the petitioner, a tier III offender, must register in person four times per year, and tier I and II offenders must register in person twice per year. *See* RSA 651-B:4, I. Some courts have found in-person requirements to be a restraint. *See State v. Letalien,* 985 A.2d 4, 18 (Me. 2009) (finding that a quarterly, in-person reporting requirement for the remainder of an offender's life "is undoubtedly a form of significant supervision by the state" that "imposes a disability or restraint that is neither minor nor indirect"); *Starkey v. Oklahoma Dept. of Corrections,* 305 P.3d 1004, 1022 (Okla. 2013) (finding that "the affirmative 'in person' registration and verification requirements alone cannot be said to be 'minor and indirect' "); *Doe v. State,* 189 P.3d 999, 1009 (Alaska 2008) (finding that the registry scheme "compels affirmative post-discharge conduct," its "duties are significant and intrusive," and the time periods are "intrusive"). These courts found these restraints to be amplified because the failure to comply with the requirements could result in harsh prosecution and penalties, such as a fine or imprisonment. *See Letalien,* 985 A.2d at 18; *Starkey,* 305 P.3d at 1022. Given these restraints, some authorities have likened registry requirements to parole, probation, or supervised release. *See Smith,* 538 U.S. at 111 (Stevens, J., dissenting); *Starkey,* 305 P.3d at 1022-23; *Doe v. Dept. of Pub. Safety & Corr. Servs.,* 62 A.3d 123, 139 (Md. 2013).

Other courts have found that in-person requirements do not amount to an affirmative restraint or disability. *See United States v. Parks,* 698 F.3d 1, 6 (1st Cir. 2012) (finding that in-person requirements are "doubtless more inconvenient," but ultimately the inconvenience is minor compared with the disadvantages present in the act upheld in *Smith*); *Kammerer v. State,* 322 P.3d 827, 837 (Wyo. 2014). However, in those cases, the offenders subject to the requirements had the opportunity to obtain early termination of the requirements. *See* 42 U.S.C. § 16915(b) (2012); Wyo. Stat. Ann. § 7-19-304(a) (2013). This decreased the potential affirmative disability or restraint involved. *See also Letalien,* 985 A.2d at 18, n.9 (distinguishing cases that

found the in-person requirement alone not to be punitive by noting that in many of those cases the laws "afforded offenders the opportunity to seek the early termination of the registration requirement."). The petitioner in this case cannot ever seek termination of his registration requirements.

Second, the record in *Smith* contained "no evidence that the Act has led to substantial occupational or housing disadvantages for former sex offenders that would not have otherwise occurred." *Smith*, 538 U.S. at 100. Here, however, the petitioner alleges he was not able to move in with his son or obtain public housing because of his status as a registered sex offender. Although these effects could be a result of his crime and not the registration itself, it bears mention that the federal act that denied him public housing specifically prohibits "lifetime registrants" from residence, and not simply people who have committed crimes that trigger registration. *See* 42 U.S.C. § 13663 (2012). It could be argued, then, that the petitioner's housing disadvantages are a direct result of his placement on the registry and not simply of the crime he committed. Likewise, although it is possible that his son's neighbors could have learned about his past criminal behavior through other means, the flyers they distributed in their effort to keep him out of the neighborhood suggested that their knowledge came from the registry.

Other courts have acknowledged that many of the negative effects that registrants experience flow from the crime they committed, but the registry, particularly because it is publicly available online, increases these effects exponentially. *Doe*, 189 P.3d at 1011 ("There is a significant distinction between retaining public paper records of a conviction in state file drawers and posting the same information on a state-sponsored website; this posting has not merely improved public access but has broadly disseminated the registrant's information, some of which is not in the written public record of the conviction."); *Starkey*, 305 P.3d at 1023-24 ("Although some of the information . . . may otherwise be available, the internet has increased the unrestricted dissemination of personal information of sex offenders."). This broad dissemination stigmatizes registrants and can lead to further harm, such as "vigilante justice." *Doe*, 189 P.3d at 1009; *Wallace*, 905 N.E.2d at 379-80.

Under our act, the petitioner must report in person, four times per year, for life. RSA 651-B:4, I(a). The reporting must be done at specified times — within five days of petitioner's birthday, and within five days of every three months thereafter. *Id.* He must fill out a form and provide detailed information, including his height, weight, tattoos or markings, vehicle information, addresses, all online identifiers, and more. RSA 651-B:4, III, :4-a. Further, he must inform the authorities within five days if any of this information changes. RSA 651-B:5, I. Each time he reports, he can be

photographed, and may be fingerprinted and required to give a DNA sample, if he has not previously done so. RSA 651-B:4, IV. He must also respond to letters or in-person address verifications by the department twice per year, RSA 651-B:3, III, and respond to any home visit that the local police opt to make. RSA 651-B:3, IV. For the petitioner, this will continue for the rest of his life, and he is subject to criminal penalties if he fails to comply. *See* RSA 651-B:9, I-III.

The information that the petitioner is required to report, particularly his current address and appearance, exceeds the information contained in his criminal record. Displaying this information on the internet is also significantly different from maintaining records elsewhere. Although the information that the petitioner is required to report may not be entirely private, it is generally not readily accessible to any member of the public, at any time, for any reason. For instance, a person's height, weight, tattoos, scars, or birth date may be widely known or readily apparent, but these details are usually not just a few mouse clicks away. Under the current act, there is no record kept of who accesses this information, further increasing the ease and casualness with which it may be accessed.

The petitioner is not prohibited from changing residences, jobs, or appearance. The restraints on his behavior, then, are not comparable to those associated with parole or probation. However, the frequent reporting and checks by the authorities at the petitioner's residence do entail a level of oversight by the State to which few citizens are subject. Such requirements, which mandate affirmative actions and may have had effects on the petitioner's housing, exceed simply burdening or disadvantaging the petitioner, and we can no longer find that the effects are "*de minimis*." *See Costello*, 138 N.H. at 591. Instead, we agree with the Supreme Judicial Court of Maine that "it belies common sense to suggest that a newly imposed lifetime obligation to report to a police station every ninety days to verify one's identification, residence, and school, and to submit to fingerprinting and provide a current photograph, is not a substantial disability or restraint." *Letalien*, 985 A.2d at 24-25. Thus, this factor weighs in favor of finding a punitive effect.

The second factor is whether the registration requirements are analogous to historical punishment. *Mendoza-Martinez*, 372 U.S. at 168. Sex offender registries are relatively recent in history and, as such, cannot be expected to mirror an exact form of historical punishment. *See Smith*, 538 U.S. at 97. Still, the petitioner argues that the act resembles the colonial punishment of shaming.

The Supreme Court noted that shame or stigma was not the objective of these laws, as it was for the historical punishment of shaming, and that

historical shaming entailed more than just disseminating information. *Smith*, 538 U.S. at 98. The act, however, by including the petitioner on a list of registered sex offenders, does more than merely disseminate information. If the registry were truly just about making criminal records more easily available to the public, then all such records would be available. Instead, only certain offenders are listed on the website. This "[s]election makes a statement." *Id.* at 109 (Souter, J., concurring). The website may not contain any derogatory words or explicit warnings, but the mere fact that certain individuals are on the list signals that they are worthy of such recognition. The act also makes the information readily and instantly accessible to anyone who wants it, which is not often the case for other public information and records.

There is evidence that the petitioner has experienced shame and stigma because of the registry. For example, he is too embarrassed to inform his doctors about his status as a registered sex offender, and his son's neighbors, by posting flyers about him, were successful in their efforts to prevent him from moving into their neighborhood. It might be that these effects are "merely a necessary consequence of the Act's intent to protect the public from harm," *Kammerer*, 322 P.3d at 836, but the *effects* themselves are negative and real, and are the focus of our inquiry at this step of the analysis.

Although the act's requirements do not exactly replicate the historical form of shaming, this factor inquires only whether the act is *analogous* to a historical punishment, not whether it is an exact replica. We must recognize that our world has changed. The purpose of colonial shaming was to punish the offender by holding the offender out to the community as someone to be shunned or ridiculed. However, shaming also served to notify the community of the crime committed and the individual who committed it, so that members of the community could protect themselves. The act does the equivalent in our modern times. Our communities have grown, and in many ways, the internet is our town square. Placing offenders' pictures and information online serves to notify the community, but also holds them out for others to shame or shun. Other courts have found that the resemblance to shaming gives sex offender registration statutes a punitive effect under this factor. *Doe*, 189 P.3d at 1012; *Doe v. Dept. of Pub. Safety & Corr. Servs.*, 62 A.3d at 140; *see also Smith*, 538 U.S. at 116 (Ginsburg, J., dissenting). Because the act bears at least some resemblance to shaming, we find that this factor weighs in favor of finding a punitive effect.

The third factor is "whether [the act] comes into play only on a finding of *scienter*."[5] *Mendoza-Martinez*, 372 U.S. at 168. For this factor, "[i]f a sanction is not linked to a showing of *mens rea*, it is less likely to be intended as a punishment." *Wallace*, 905 N.E.2d at 381. The finding of scienter is usually "an important element in distinguishing criminal from civil statutes," *Kansas v. Hendricks*, 521 U.S. 346, 362 (1997), but in these types of cases, this factor "[is] of little weight." *Smith*, 538 U.S. at 105. For this reason, in *Smith*, the Supreme Court did not analyze this factor. *Id.*

RSA chapter 651-B applies to offenders who have committed a variety of offenses. *See* RSA 651-B:1, V, VII (Supp. 2014). Most, if not all, of the underlying offenses require a finding of scienter. Because the majority of the offenses that subject an offender to the requirements of the act require scienter, this factor implies a punitive effect. *See Doe*, 189 P.3d at 1012-13; *Wallace*, 905 N.E.2d at 381; *Starkey*, 305 P.3d at 1027. Nonetheless, inasmuch as the very rationale for the act is predicated upon the prior criminal conduct of registrants, we agree with the Supreme Court and conclude that this factor weighs only marginally in favor of a finding that the act is punitive.

The fourth factor we must examine is whether the statute promotes the traditional aims of punishment — retribution and deterrence. *Mendoza-Martinez*, 372 U.S. at 168. "Retribution is vengeance for its own sake. It does not seek to affect future conduct or solve any problem except realizing 'justice.' Deterrent measures serve as a threat of negative repercussions to discourage people from engaging in certain behavior." *Artway v. Attorney General of State of N.J.*, 81 F.3d 1235, 1255 (3d Cir. 1996). The *Smith* Court stated that just because a law deters behavior does not make it punishment. *Smith*, 538 U.S. at 103. Our focus, then, is mainly upon the retributive effects of RSA chapter 651-B.

The act applies to a broader category of persons than those convicted of a crime, but still requires one to have been charged with criminal conduct and to have had the charges resolved in a manner that indicates at least some level of culpability for the conduct. *See* RSA 651-B:1, XI(a) (requiring registration of individuals charged with an offense that resulted in one of the following outcomes: conviction; a finding of not guilty by reason of insanity; a juvenile adjudication requiring the juvenile to register in this state or another; or an order committing the person as a

---

[5] Scienter is "[a] degree of knowledge that makes a person legally responsible for the consequences of his or her act or omission; the fact of an act's having been done knowingly, esp. as a ground for civil damages or criminal punishment." BLACK'S LAW DICTIONARY 1547 (10th ed. 2014).

sexually violent predator). The act requires offenders to register based only upon their past action, and not on any individualized assessment of current risk or level of dangerousness.

 When such requirements are "imposed equally upon all offenders, with no consideration given to how dangerous any particular registrant may be to public safety, that restriction begins to look far more like retribution for past offenses than a regulation intended to prevent future ones." *Com. v. Baker*, 295 S.W.3d 437, 444 (Ky. 2009). The legislature may not have intended the act to advance retributive or deterrent goals, but "it strains credulity to suppose that the Act's deterrent effect is not substantial, or that the Act does not promote community condemnation of the offender, both of which are included in the traditional aims of punishment." *Wallace*, 905 N.E.2d at 382 (citation and quotation omitted). Therefore, we find that this factor weighs in favor of finding a punitive effect.

 The fifth factor is whether the act applies to behavior that is already a crime. *Mendoza-Martinez*, 372 U.S. at 168. If a statute applies to behavior that is already criminal, it weighs in favor of finding that the effects are punitive. *Doe*, 189 P.3d at 1014. The Supreme Court did not consider this factor in *Smith*, reasoning that because recidivism was the concern addressed by the law, a past crime was a necessary starting point for the act to take effect. *Smith*, 538 U.S. at 105. However, in his dissent, Justice Stevens found it significant that "a criminal conviction under these statutes provides both a *sufficient* and a *necessary* condition for the sanction." *Id.* at 112 (Stevens, J., dissenting). He also stated:

> No matter how often the Court may repeat and manipulate multifactor tests that have been applied in wholly dissimilar cases involving only one or two of these three aspects of these statutory sanctions, it will never persuade me that the registration and reporting obligations that are imposed on convicted sex offenders *and on no one else* as a result of their convictions are not part of their punishment. In my opinion, a sanction that (1) is imposed on everyone who commits a criminal offense, (2) is not imposed on anyone else, and (3) severely impairs a person's liberty is punishment.

*Id.* at 113. In a separate concurrence, Justice Souter echoed this point:

> The fact that the Act uses past crime as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on; when a legislature uses prior

> convictions to impose burdens that outpace the law's stated civil
> aims, there is room for serious argument that the ulterior purpose
> is to revisit past crimes, not prevent future ones.

*Id.* at 109 (Souter, J., concurring). Other courts have considered this factor and have found it indicates a punitive effect. *See Doe*, 189 P.3d at 1015; *Wallace*, 905 N.E.2d at 382; *Letalien*, 985 A.2d at 22; *Starkey*, 305 P.3d at 1028.

Like the acts in other states, the requirement to register under RSA chapter 651-B generally does not hinge upon a showing of potential, individual risk. However, unlike the statutes considered in other cases, New Hampshire's act imposes the burden of registering on some persons who were not *convicted* of a crime. RSA 651-B:1, XI(a).[6] Nonetheless, it seems clear that the overwhelming majority of those to whom the statute applies are included because they have a criminal conviction for a triggering offense — a circumstance that is indicative of some punitive effect.

The sixth factor is "whether an alternative purpose to which [the act] may rationally be connected is assignable for it," *Mendoza-Martinez*, 372 U.S. at 168-69. Courts have interpreted this factor in this context as whether the act is rationally connected to a legitimate regulatory purpose. *Doe*, 189 P.3d at 1015; *see also Starkey*, 305 P.3d at 1028. The Supreme Court found, and we agree, that this is "a most significant factor in [the] determination that the statute's effects are not punitive." *Smith*, 538 U.S. at 102 (quotation and brackets omitted). The Court made it clear that a statute does not need to have a close or perfect fit with its non-punitive aims. *Id.* at 103. The Court found that the Alaska registry had a legitimate non-punitive purpose — public safety — that was valid and rational, and was advanced by the act. *Id.* at 103-05. The petitioner concedes that our act has a legitimate regulatory purpose as applied to offenders who present a risk of reoffending. Based upon the statute as written, the legislature has decided that *all* prior offenders present some risk. Whether that is true may be a debatable point, but regardless, this legislative determination is rationally related to its regulatory aim; and consequently there is a valid, and compelling, regulatory purpose to RSA chapter 651-B, even if there is not a perfect fit. Therefore, this factor weighs against finding a punitive effect.

The seventh factor in our analysis is whether the act "appears excessive in relation to the alternative purpose assigned." *Mendoza-Martinez*, 372 U.S. at 169. The Supreme Court has stated that the

---

[6] For example, the registry requirements were triggered only by a conviction in *Doe*, 189 P.3d at 1015 (Alaska); *Wallace*, 905 N.E.2d at 382 (Indiana); and *Letalien*, 985 A.2d at 22 (Maine).

"question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective," and not "whether the legislature has made the best choice possible to address the problem it seeks to remedy." *Smith*, 538 U.S. at 105. "A number of courts give greatest weight to this factor." *Wallace*, 905 N.E.2d at 383; *see also Smith*, 538 U.S. at 116 (Ginsburg, J., dissenting) ("What ultimately tips the balance for me is the Act's excessiveness in relation to its nonpunitive purpose.").

RSA chapter 651-B imposes numerous requirements upon registrants, mandating, among other things, that they appear in person at the police station several times per year to report detailed and personal information, and that they be visited by local authorities twice per year at their residence. The information provided, along with a current photograph and physical identifiers, is put online for anyone to access. For the petitioner, these requirements will continue for the rest of his life. Notably, there is no way for the petitioner to be relieved of the requirements, even though he has not reoffended in 30 years, has completed counseling, was discharged from probation early, and is currently permanently disabled.

Although there is a regulatory purpose underlying this statute, we find that the act as currently constituted is excessive when compared with this purpose, and when compared with past versions of the act. Though many of the amendments serve a clear purpose to better the registry scheme or to make it more useful to the public, other aspects of the act serve no readily-apparent non-punitive purpose. For example, although requiring offenders to register in person periodically and checking up on them at their residences might be important to ensure the veracity of their information, which furthers the public protection purpose of the act, the same cannot be said for the requirement that *all* tier II and tier III offenders be registered *for life* without regard to whether they pose a current risk to the public. We find the lifetime duration of the registry in particular to be excessive, when considered with all of the act's other impositions. If in fact there is no meaningful risk to the public, then the imposition of such requirements becomes wholly punitive. For these reasons, we find that this factor weighs heavily in favor of finding a punitive effect.

## C

In summary, our analysis leads us to conclude that RSA chapter 651-B has a punitive effect as applied to the petitioner. We recognize the important interests that the legislature seeks to further with this statute, but, in our view, the punitive effect of the current act is enough to overcome any non-punitive legislative intent as to this petitioner. The statute has changed dramatically since the time of *Costello*, to the point where the

punitive effects are no longer "*de minimis.*" *Costello*, 138 N.H. at 590. No one amendment or provision is determinative, but the aggregate effects of the statute lead us to our decision. Although there is a presumption in favor of a statute's constitutionality, here this presumption has been overcome because we are convinced that the punitive effects clearly outweigh the regulatory intent of the act.

## D

Because we find that RSA chapter 651-B is punitive in effect, we must next address the question of a remedy for the resultant *ex post facto* violation. As discussed in section III, *supra*, the act has been amended frequently since *Costello* was decided, incrementally increasing the burdens and intrusiveness of the registration system with each amendment. In these circumstances, it is not realistic for us to attempt to parse the various amendments to determine precisely at what point the act became sufficiently punitive as to prohibit its retroactive application. *Cf. State v. Williams*, 952 N.E.2d 1108, 1113 (Ohio 2011) ("No one change compels our conclusion that [Ohio's sex offender registry statute] is punitive. It is a matter of degree whether a statute is so punitive that its retroactive application is unconstitutional."). Consequently, were we simply to invalidate the act as violative of the prohibition against retrospective laws, individuals who, based upon conduct that predated the enactment of the current version, became subject to iterations of the statute prior to the current version arguably would either have no obligation to comply with the act at all, or at least have no obligation to comply with any requirements not in effect at the time *Costello* was decided. Because the current act furthers legitimate and important public safety concerns, such a ruling would produce unwarranted consequences.

Absent the lifetime-registration-without-review provision, we would not find the other effects of the act sufficiently punitive to overcome the presumption of its constitutionality.[7] Accordingly, to prevent an untoward result that would substantially undermine the act's public protection goals, we conclude that the act can be enforced against the petitioner consistently with the constitutional prohibition against retrospective laws only if he is promptly given an opportunity for either a court hearing, or an administrative hearing subject to judicial review, at which he is permitted to

---

[7] We recognize that the version of the act that we found non-punitive in *Costello* also called for certain offenders to be registered for life. However, as explained in the text, the act at issue in *Costello* imposed far less onerous requirements on offenders than does the present act. It is the cumulative effect of the registration requirements imposed by the current act that leads us to conclude that the act must be regarded as punitive in the absence of a mechanism for an offender, such as the petitioner, to demonstrate that he no longer poses a risk sufficient to justify continued registration.

demonstrate that he no longer poses a risk sufficient to justify continued registration. If the hearing results in a finding that he has made the required showing that he is not a danger to the public, he must be relieved from the requirements of registration. If, after such hearing, it is determined that he has not made the required showing, he must continue to comply with the act, but thereafter he must be afforded periodic opportunities for further hearings, at reasonable intervals, to revisit whether registration continues to be necessary to protect the public.

It is not our role to determine the precise point at which the duration of registration provisions of the current act becomes punitive as to tier II or tier III offenders who are not given an opportunity to show that continued registration is unnecessary, or precisely how often periodic review hearings must be held — that kind of line-drawing is a task for the legislature. *See Williams v. State*, 81 N.H. 341, 353 (1924), *overruled in part on other grounds by Amoskeag &c. Co. v. Dartmouth College*, 89 N.H. 471 (1938) ("But the court cannot choose for the lawmakers; to select one of the rates and apply it to all the classes would be an act of legislation not of construction."). To decide the present case, which the petitioner brought as an as-applied challenge, we need only hold that the petitioner before us can no longer be subject to the act's requirements unless he is afforded a hearing and some reasonable opportunity for further hearings while he remains subject to registration. We also leave to the legislature, or to the department of safety, to fashion, by statute or by regulation, the particulars of the hearing process, with the caveat that the hearing must be conducted with reasonable promptness and must meet standards of fundamental fairness. Unless and until alternative procedures have been established, the superior court shall conduct the hearings required by this opinion.

The remedy that we impose here to save the constitutionality of the act has been employed previously by this court, albeit in other contexts. *See, e.g., Petition of Bagley*, 128 N.H. 275, 287 (1986) (holding that for finding of child abuse or neglect to be validly maintained in division for children, youth and families (DCYF) central registry, perpetrator must be provided written notice of the report on which the allegations are based and the reasons for DCYF's determination, access to pertinent DCYF documents, the right to challenge the determination at an administrative hearing, and, if the determination is upheld, a written post-hearing statement of the grounds for such ruling); *White v. Lee*, 124 N.H. 69, 77 (1983) (in order to avoid ruling that tax sale procedures violated due process rights of current property owners, obligations imposed on taxing authorities to provide reasonable notice to current owners when property is to be sold based upon prior owners' non-payment of taxes); *see also Welsh v. United States*, 398 U.S. 333, 355-56 (1970) (Harlan, J., concurring) (agreeing with the Court's

decision to extend the conscientious objector exception to those with ethical, but non-religious, reasons for avoiding military service, by use of "the presumed grant of power to the courts to decide whether it more nearly accords with Congress' wishes to eliminate its policy altogether or extend it in order to render what Congress plainly did intend, constitutional"). Given its legitimate regulatory objectives, we are confident that, faced with the alternatives of invalidation of the act as to the petitioner and those similarly situated, or implementation of the hearings requirements mandated herein, the legislature would choose the latter option. *Cf. Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984) (plurality opinion) (stating that determination of whether a statute is severable is essentially an inquiry into legislative intent).

We recognize that we have previously employed the hearing remedy fashioned here in the context of claims of alleged due process violations, and that the *ex post facto* claim raised by the petitioner is of a different character. Nonetheless, we find this remedy to be suitable because it permits a factual determination to be made as to whether the petitioner poses the continuing risk to the public that provides the justification for imposition of the act's requirements as a non-punitive regulatory measure.

## V

Alternatively, the petitioner claims that RSA chapter 651-B, as applied to him, violates his right to procedural due process guaranteed by Part I, Article 15 of the New Hampshire Constitution. The petitioner argues that this right was violated because he was never notified that, as a consequence of pleading guilty to the sexual assault charges in 1987, he would be subjected to the registry requirements for life, with no recourse. Although the petitioner does not explicitly frame it as such, his due process argument has two components: (1) that he was not notified of the requirements that would be imposed upon him before he pleaded guilty; and (2) that he was not given an opportunity to demonstrate that he should not be subject to the act's requirements. As to the first component, because the act was not in place at the time that the petitioner pleaded guilty, he could not possibly have been notified of its requirements. This aspect of the petitioner's due process claim, which, in effect, argues that it is unfair to require him to comply with consequences of his actions of which he could not have been aware at the time of his conduct, amounts to nothing more than a reiteration of his *ex post facto* claim. *See Landgraf v. USI Film Products*, 511 U.S. 244, 266-67 (1994) (noting the "fair warning" interest protected by the *Ex Post Facto* Clause). Because we have already addressed the

414

substance of that claim, we need not consider it further under the rubric of due process. We will, however, address the second part of his due process argument.

 Part I, Article 15 provides that "[n]o subject shall be . . . deprived of his property, immunities, or privileges . . . or deprived of his life, liberty, or estate . . . but by the law of the land." N.H. CONST. pt. I, art. 15. We have held that "law of the land" means due process of law. *State v. Veale*, 158 N.H. 632, 636 (2009). Though the petitioner raised both a procedural and a substantive due process claim before the trial court, on appeal he asserts only the procedural claim. We engage in a two-part analysis in addressing procedural due process claims: first, we determine whether the individual has an interest that entitles him or her to due process protection; and second, if such an interest exists, we determine what process is due. *Id.* at 637-39. "The ultimate standard for judging a due process claim is the notion of fundamental fairness." *Saviano v. Director, N.H. Div. of Motor Vehicles*, 151 N.H. 315, 320 (2004). "Fundamental fairness requires that government conduct conform to the community's sense of justice, decency and fair play." *Id.* Because the petitioner brings this claim under the New Hampshire Constitution, we rely upon federal law only to aid our analysis. *Ball*, 124 N.H. at 231-33.

The petitioner argues that RSA chapter 651-B interferes with three protected interests: his right to privacy; his right to be left alone from unreasonable government intrusion; and his right to be free from reputational and social stigma. Assuming arguendo that the petitioner has a legally-protected interest entitling him to due process protection, we proceed to the next step of the analysis; that is, what process is due.

 To determine what process is due, we balance three factors: (1) the private interest that is affected; (2) the risk of erroneous deprivation of that interest through the procedure used and the probable value of any additional or substitute procedural safeguards; and (3) the government's interest, including the fiscal and administrative burdens brought about by additional procedural requirements. *State v. LaPlaca*, 162 N.H. 174, 178 (2011). "The requirements of due process are flexible and call for such procedural protections as the particular situation demands." *Veale*, 158 N.H. at 642 (quotation and brackets omitted).

 The petitioner argues that he should be given a hearing or individual risk assessment to determine if he should be included on the registry.[8] However, under RSA chapter 651-B, offenders like the petitioner

---

[8] Although we have concluded in our *ex post facto* analysis that the petitioner is entitled to a hearing in order for the act to be validly applied to him, this ruling is predicated on the fact

are required to register based upon their past actions alone, and not upon any determination of current risk or dangerousness. *See* RSA 651-B:1, XI. Therefore, even if the petitioner were afforded a hearing or given the chance to prove that he is not a risk, his due process rights would not be implicated. To require registration, all the State need show is proof that he committed the triggering crime. The petitioner was afforded due process during the proceeding that led to his criminal conviction, and he does not argue otherwise. Under the act, there is no risk of an erroneous deprivation of a protected interest through the current procedure used because a conviction of one of the included crimes, which the petitioner undisputedly committed, is enough to take away that interest. There would be no value in having a hearing or other procedure to determine a fact that is not at issue under the statutory scheme. *Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 4 (2003) (holding that Connecticut's sex offender registry scheme, which was based upon previous convictions and did not provide hearings to determine current dangerousness, did not violate the federal Due Process Clause because "due process does not require the opportunity to prove a fact that is not material to the State's statutory scheme"). No process is due beyond what the petitioner was already afforded in his criminal case, and, therefore, the act does not violate his right to procedural due process.

## VI

For the reasons stated above, the judgment of the superior court is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*Affirmed in part; reversed in part; and remanded.*

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred.

---

that, because his conduct which triggered application of the act occurred before the act became law, the requirements of the act are punitive in the absence of the vehicle of a hearing through which he may be relieved of such requirements. In contrast, if the petitioner's due process argument had merit, it would require a hearing regardless of any retrospective application of the act and arguably could require that the hearing be broader in scope or applicability than that mandated for *ex post facto* purposes. For this reason, we address his due process claim notwithstanding that we have granted him certain relief under his *ex post facto* claim.